## No. 12,561.

### GEORGE F. PATTON VS. THOMAS PICKLES.

In a contract for ferriage, safe transportation is not merely an incident of the contract, but it is its very direct object. When the obligor fails to perform that obligation the obligee is entitled to damages just as the obligee is entitled to damages for inexecution of any other contract unless the obligor can offer just and legal reasons for non-execution.

He who claims the execution of an obligation must prove it. On the other hand he who contends he is exonerated must prove the fact which has produced the extinction of the obligation. The very fact itself of the non-execution of a contract carries with it the presumption of a "contractual fault" from which the obligor has thrown upon him the *onus* of freeing himself.

Where a person having paid for a ticket for ferriage has, on invitation of the employees of the ferry company, passed out upon an iron bridge leading to the ferry-boat, and while standing thereon it broke, precipitating her into the river, it is not for the passenger to prove that the breaking was due to the negligence of the company, but upon the company to establish affirmatively a state of facts which would release it from responsibility.

A PPEAL from the Civil District Court for the Parish of Orleans. *Théard, J.*

*O. B. Sansum* for Plaintiff, Appellee.

*Frank E. Rainold, Frank N. Butler* and *Bernard McCloskey* for Defendants, Appellants.

Argued and submitted March 11, 1898.
Opinion handed down April 18, 1898.

The opinion of the court was delivered by

NICHOLLS, C. J. The defendant, Thomas Pickles, has held for many years, under contract with the city of New Orleans, the franchise for ferrying passengers, wagons, etc., from the foot of Canal street, on the left bank of the Mississippi river, to Algiers, on the opposite side of the same stream, and from Algiers to the city of New Orleans.

Passengers intending to cross from Algiers to Canal street pass first into a large room erected upon the river bank, from which, through a door opening toward the river, they pass upon an inclined iron bridge or gangway leading down from the ferry house to a pontoon bridge below.

This pontoon bridge rises and falls with the rise and fall of the Mississippi river. It is moored alongside of a line of piling which receives the push or shock of the ferry boat as it lands against the pontoon. The iron inclined bridge passes between some of the pilings, but its outer edge is not intended to pass beyond the outer edge of the piling. The immediate connection between the iron bridge and the pontoon is by means of an apron which is expected to slide as occasion requires. At the entrance of the ferry house on the shore side is a turning stile through which passengers pass, one by one, paying their fare as they pass through. It is furnished with a check, which being applied, prevents any one from entering the room.

Wagons and vehicles about to be crossed go through a side gate upon a wagon gangway leading down to the pontoon bridge. There is no connection between this gangway and the iron bridge. On the night of the 19th, or the morning of the 20th of October, 1895, a disastrous fire occurred in Algiers, which attracted during that day to the latter place very large crowds, the number being estimated to be between ten and fourteen thousand persons. While numbers returned to the city, a very large number remained on the Algiers side until nearly dark, when they commenced crowding to take passage back upon the ferry boat. Among the persons so returning at that time were the wife of the plaintiff and her son, a boy about ten or eleven years old. They paid their fare at the turning stile and passing through the ferry room, went out for several feet upon the iron bridge. The lower part of the bridge was then crowded with persons, while others continued to pass out upon the upper portion from behind through the ferry room. The situation was such as to make it difficult for Mrs. Patton and her child to return. They attempted to do so, but before they could pass into the ferry house, the iron bridge broke at about its middle point and precipitated her into the river.

She received painful injuries from her fall, and contracted from her wet clothing a serious attack of bronchitis. Defendant, on appeal, maintains that judgment was erroneously rendered in plaintiff's favor for damages for her injuries so received.

The *syllabus* of defendant's brief is as follows:

1. "Plaintiff proved that the bridge, belonging to defendant leading from the waiting room of the ferry house to the pontoon or

floating wharf, broke, and she was injured thereby.   No negligence of any kind is proved and the court is asked to presume negligence from the mere fact of accident, and likewise to presume that the plaintiff was not guilty of contributory negligence.

2.  No such presumption can arise in favor of a person except he is being passively conveyed in the vehicle of a common carrier. While the passenger is on the platform, bridge, in the station house, or any other portion of the premises of a common carrier, moving from place to place of his own volition, the carrier occupies toward him the precise relation of any other owner of real estate toward the customer who comes upon his premises.   If he is injured, in order to recover damages he must prove negligence on the part of the carrier and likewise prove that he was free from contributory negligence.   Thompson's Carriers of Passengers, pages 104, 209, 214.

3.  The burden of proof is therefore upon the plaintiff to establish negligence, but (*ex industria*) defendant has proved that he was in no wise negligent.   He proved that the bridge which collapsed was built according to plans and specifications which were approved by the City Surveyor; that he was the proper officer to approve the same, being designated as such by the contract.   That said plans called for the construction of a bridge calculated to carry one hundred pounds to the square foot with a factor of safety of six, and a bridge of this character is strong enough to sustain the dead weight of all persons who could stand upon it.   That it was constructed by bridge builders of national repute, and finally, when the bridge was completed, it was inspected and approved by the city surveyor as being in accordance with plans and specifications; that it was likewise proved that the bridge was only eight years old and had in no manner deteriorated in strength, the bridge being of iron.   That in regard to the bridge the defendant exercised all the care and diligence that human foresight and the experience of twenty years as lessee of the public ferries could suggest; that it was proved that an extraordinary and unforeseen event caused nearly fourteen thousand people to cross the ferry on that day, three times as many as had ever crossed on a single day.   That the crowd in attempting to get home from Algiers became excited and uncontrollable; that they rushed into the ferry house, some paying fares and others not; that the attempt of the superintendent to control the mob was futile; that they crowded, pushed and jammed themselves upon the bridge

in their anxiety to get home before dark, and this crowd, of which plaintiff's wife was a part, broke the bridge. That the experience of defendant for twenty years as lessee of the ferries had not led him to anticipate such a crowd and he had no reason to believe that the passengers would behave in so unreasonable a manner.

That every precaution suggested by an extended and practical experience was exercised by the superintendant upon the occasion. That the lessee was himself at the time sick in bed of the disease of which he ultimately died.

4. Ferry companies are not insurers of the absolute safety of passengers, either while coming on board the ferry boats, or while going ashore therefrom, nor are they bound to guard against probable accidents which could not reasonably be foreseen. Their duty is to furnish accommodations for the receiving and landing of passengers, which are reasonably sufficient for their purpose and for the protection of persons using the means provided in a reasonable way. (Blackman vs. London, etc., R. Co., 17 W. B. 769; Riggs vs. Manchester, etc., R. Co., 12 Jur. (N. S.) 525; Cornman vs. Eastern Counties R. Co., 4 H. & N. 781; Crafter vs. Metropolitan R. Co., L. R., 1 C. P. 300; Dougan vs. Chaplain, Tr. Co., 56 N. Y. 1; Crocheran vs. North Shore, etc., Ferry Co., Id. 656; reversing 1 N. Y. Sup. Ct. (T. & C.) 446; Cleveland vs. New Jersey Steamboat Company, 68 N. Y. 306.) It is not enough to make out a case of negligence to suggest that additional precautions would have prevented the accident. Loftus vs. Union Ferry Company, 22 Hun. 33, granting new trial after verdict for plainiiff. Dyer vs. New York, L. E. & W. Ry. Co., 7 Atlantic Reporter, Vol. 7, p. 417; 138 N. Y. Court of Appeals, 647. Amer. and Eng. Encyclopedia of Law, Vol. 2, p. 804; Vol. 7, p. 949, par. 4.''

Defendant quotes the New York Court as saying in Cleveland vs. The New Jersey Steamboat Co. that: '' A carrier of passengers is not bound to foresee and provide against casualties never before known and not reasonably to be expected (56 N. Y. 1; 52 N. Y. 32, 656). Hence his duty is not to be estimated by what, after an accident, then first appears to be a proper precaution against a recurrence of it.'' (Bowen vs. N. Y. Central R. R. Co., 18 N. Y. 408.)

He quotes the same court in Loftus vs. Union Ferry Company of Brooklyn, 84 N. Y. 460, in which it said:

'' We think this case is governed by the cases of Dougan vs. Chap-

lain Trans. Co., 56 N. Y. 1; Cochran vs. North Shore Staten Island Ferry Co., *Id.* 656; and Cleveland vs. New Jersey Ferry Co., 68 N. Y. 306. The defendant was bound " to provide suitable and safe accommodations for the landing of passengers." The rule of the strictest diligence in this respect is the only one consistent with a due regard to the value of human life and with the relation which the defendant assumed to the public. But the rule does not impose upon the defendant the duty of providing for the safety of its passengers, that they shall encounter no probable dangers and meet with no casualty in the use of the appliances provided by it. It was possible for the defendant so to have constructed the guard that such an accident as this could not have happened."

" If defendant ought to have foreseen that such an accident might happen, or such an accident could reasonably have been anticipated, the omission to provide against it would be actionable negligence. But the facts rebut any inference of negligence on this ground. The company had the experience of years certifying to the efficiency of the guard. That it was possible for a child, or even a man to get through the opening was apparent enough, but that this was likely to occur was negatived by the fact that multitudes of persons had passed over the bridge without the occurrence of such a casualty. If the structure was intrinsically insecure, the fact that it had been used without injury before this would not exempt the company from responsibility when it did occur from its defective condition. We think the exemption of the defendant in this case rests upon the fact which we think clearly appears as an inference from the other facts, that the company had no reason to apprehend an accident like this, and that the arrangements made were such as experience had, up to that time, shown to be safe and suitable and sufficient to meet the requirements of its duty."

" The line which separates a pure misadventure, resulting in injury for which no one is responsible, from accident creating a responsibility by reason of negligence, is often narrow and difficult to be drawn, but we think the casualty in this case is of the former and not of the latter class."

He (defendant) further refers to the cases of Race vs. Union Ferry Co. of New York and Brooklyn, 138 N. Y. 647, and Dwyer vs. N. Y., Long Island & Western Railroad Co., in the former of which the court held that " the ferry company in the management of its busi-

ness had the right to assume that passengers would take care of themselves, and if it conducted its business with such care and skill as would make the entrance upon its boats safe for persons of ordinary prudence, it met the requirements of the law. The proof on the part of the defendant showed that all its ferries were managed in substantially the same way, and that while they carried many millions of passengers yearly no accident of this kind was ever reported or known; that the plaintiff had the burden to show that the defendant was guilty of culpable negligence and that in that particular case plaintiff had failed to sustain that burden." And in the second of which cases, it declared that "if a person on leaving a ferry-boat voluntarily joins a crowd which is so dense as to prevent him from seeing where he treads, and voluntarily proceeds with such crowd and is injured by his foot being caught between the boat and the dock, such conduct manifests, *per se*, contributory negligence and he should be non-suited."

Plaintiff on the other hand insists that Thompson on Carriers of Passengers (p. 210) correctly lays down as a general rule that where an injury happens to a passenger, in consequence of the breaking of the vehicle, roadway or other appliance owned or contracted by the carrier and used by him in making the transit, the person entitled to sue for an injury makes out a *prima facie* case for damages against the carrier by showing the contract of carriage—that the accident happened in consequence of such breaking or failure and that in consequence of this accident he sustained damages. That when these facts are made to appear it will devolve upon the carrier to excuse this *prima facie* neglect of duty to show that notwithstanding the accident happened as shown by the plaintiff's evidence, it happened in spite of the use by himself, his servants and the contractors by whom his roadway appliances and vehicles were built, of the greatest degree of diligence practicable under the circumstances. In other words, he must show in order to rebut this presumption that the accident resulted from circumstances against which human care and foresight could not guard."

Defendant contends that this rule does not apply where the occasion of the hurt of the passenger was an active, voluntary movement on his part, combined with some alleged deficiency in the carrier's means of transportation or accommodation, and the reason is that in such cases it is necessary to consider whether there may not

have been contributory negligence on the part of a passenger. That it is only in respect of those accidents which happen to the passenger while he passively trusts himself to the safety of the carrier's means of transportation, or to the skill, diligence and care of his servants, that the rule applies. That the rule imposing upon the carriers of persons the highest degree of care has this limitation, it applies only to those means and measures of safety which the passenger of necessity trust wholly to the carrier. That in general it is applicable only to the period when the carrier is, in a certain sense, the bailee of the person of the passenger. That where the passenger is injured by reason of certain defects in the buildings or grounds of the carrier's before the transit has commenced, or after it has ended, the carrier is or is not liable accordingly as he has or has not been guilty of want of ordinary care. That in this respect he occupies toward the passenger the precise relation of any other owner of real estate toward his customers who come upon his premises for the purpose of transacting business.

That though carriers are bound to keep in a safe condition all portions of their platforms and approaches thereto to which the public do or would naturally resort, and all portions of their station grounds, reasonably near to the platforms where passengers, or those who have purchased tickets with a view to take passage on their cars, would naturally or ordinarily be likely to go, the duty of protection to such persons does not go to the extent of a warranty of the safe condition of the premises, neither is the carrier held bound to bestow upon their condition that extraordinary degree of vigilance which the law, from motives of the soundest policy, imposes upon him in regard to the carriage of his passengers. That the passenger, while in actual progress upon his journey, is exposed to countless hazards giving himself in charge of the carrier, and in view of the circumstances of the case the law requires of the carrier the exercise of the greatest possible diligence for the benefit of the passenger and holds him responsible for the slightest negligence, but that the rule ceases with the reason for it; therefore, as a passenger's entrance to the carrier's station is characterized by none of the hazard incident to the journey itself, the rigor of the rule is justly relaxed, in that at such a time and place the carrier is bound to exercise only a reasonable degree of care for the protection of his patrons."

The parties to the present litigation occupied contractual relations to each other. Plaintiff's wife had paid for a passage across the river from Algiers, and had, after such payment, gone within the approaches to the ferry boat, and was actually making use of the appliances furnished by the defendant for making the trip. The contract between the parties was one which from time immemorial has imposed upon the obligor exceptionally severe obligations. Safe carriage is not merely an *incident of the contract*, but it is its *very direct object*. To safely transport is precisely that which the carrier undertakes for a consideration to do. When the obligor fails to perform that obligation the obligee is entitled to damages just as the obligee is entitled to damages for inexecution *of any other contract*, unless *the obligor can offer* just *and sufficient reasons for non-execution*. What the extent of the damages would be in any given case *where the non-execution could not be* " *fully justified* " would depend upon the circumstances of the case. Art. 2232 of the Civil Code declares that he who claims the execution of an obligation must prove it. On the other hand, *he who contends that he is exonerated must prove the payment* or the fact *which has produced the extinction of the obligation*, and Art. 1926, that " on the breach of any obligation to do or not to do, the obligee is entitled to damages." The general rule is modified by the second paragraph of Art. 1923, which declares that " when, by a fortuitous event or irresistible force, the debtor is hindered from giving or doing what he has contracted to give or do, or is from the same cause compelled to do what the contract bound him not to do, no damages can be recovered for the inexecution of the contract."

Under Art. 2219, C. C., an obligor, under a contract to give, is relieved from his obligation, if he be prevented from executing it by reason of a fortuitous accident, but the article *requires him to prove* the fortuitous accident which he alleges. The particular contract which we are considering falls properly under the rules of our Code governing contracts of carriers and watermen. Art. 2754 of the Code under that heading is to the effect that " carriers and watermen are liable for the loss or damage of the things entrusted to their care unless they can prove that such loss or damage has been occasioned by accidental or uncontrollable events."

It will be seen from this that the general rule as to where lies the burden of proof for non-execution of a contract is not departed

from in the case of a carrier's contract for transportation, but it is specially reaffirmed and emphasized.

The very fact of the non-execution of the obligations of a contract carries with it of itself the presumption of a "*contractual*" fault from which obligor has thrown upon him the *onus* of freeing himself. The French writers classify faults into "fautes contractuelles" and "fautes delictuelles." The "faute delictuelle" is one which characterizes the act resulting from it as an "offence or as a *quasi*-offence." With respect to the burden of proof when the result of a suit is dependent upon the existence of such a fault having been established the general rule (subject to exceptions) is that the person alleging it must show it either directly or by proof of facts from which its existence could and would logically and fairly be inferred. Corresponding to "fautes contractuelles" and "fautes delictuelles" are "obligations contractuelles" and "obligations delictuelles," the first resulting from contracts, the second from the law. We have on several occasions referred to the fact that obligations as of "tort" could be superadded to the "*contractual obligations*" flowing from the contracts of parties (See also 30 N. E. Rep. 1021).

It is exceedingly difficult sometimes to ascertain whether a particular action as brought for damages is one "*ex contractu*" or "*ex delicto*." Our Code in one and the same article (Art. 1934, C. C.) deals as well with the damages resulting from "offences and *quasi*-offences" as from "contractual faults" proper, though without referring to matters of evidence in connection with them. It gives much more flexible powers to juries and to courts in fixing the quantum of damages in cases of tort than it does in matters of simple inexecution of contracts. When a suit is brought for damages for non-execution of a contract, the question of the burden o proof as to the character of the fault committed becomes important only when the character or *quantum* of damages is dependent upon that fact. In the case at bar there is proof positive of a contract for the safe transportation of plaintiff's wife from Algiers to the opposite side of the river over the ferry operated by the defendant, and equally positive proof that this contract was not executed by the defendant. We are of the opinion that the defendant has not shown that this inexecution resulted from accidental and uncontrollable events (C. C. 2754), and that compensatory damages would be due to the plaintiff under Art. 1933, C. C. for this non-execution

viewed from the standpoint of the violation of a contract, independent of any question of the defendant's having been guilty of an offence or *quasi*-offence. We have not overlooked the fact that Art. 2754 of the Civil Code, in reference to the responsibility of carriers, refers to the loss or damage to the "things" entrusted to their care and makes no mention of "persons." It is quite possible and probable that in some particular cases, and for some particular purposes the fact that the contract of transportation, for the inexecution of which damages are claimed in a suit, should be one for the transportation of a "person," instead of a "thing" would modify to some extent the responsibilities of the contracting parties, but not to the extent which defendant claims. While we may not be able to declare with certainty to what particular fact the breaking of the bridge which caused the injuries to plaintiff's wife should be attributed, we see enough to convince us under the evidence that defendant's course and conduct did not come up to the standard required of him as a carrier of passengers, and that plaintiff's wife was guilty of no contributory negligence. In the first place, it was at all times within the power of defendant's employee in charge of the turning of the stile at which fare was received, by making use of the check attached to the stile, to have controlled the passing of persons through the ferry house on to the iron bridge, and to prevent that point at least (which was the precise one at which the plaintiff's wife was exposed) from becoming a point of danger. It is very clear to us that he did not do so, but that he continued to receive fares and to permit persons to pass through the ferry house on to the iron bridge, up to the very moment of the accident, and that the persons standing on the passenger bridge near the ferry house, became involved in the accident as the direct result of being permitted and invited to pass upon it under dangerous conditions. In the next place, it was perfectly feasible for defendant to have prevented the crowd, which made its way to the pontoon by way of the wagon gangway from doing so by closing the gate which led to it. It was this particular portion of the crowd which defendant evidently refers to in his pleadings as the "pushing, rushing crowd," which went in without paying.

More persons may have crossed over the ferry on the day of the accident than had ever passed over it before, but defendant's employees had the experience of many "Mardi Gras" crowds (as one

of the witnesses states), and they must have known and should have anticipated that as nightfall approached there would likely be a rush to cross back to the city, and proper precautions should have been taken to guard against the crowding through the wagon-way down to the pontoon, especially as the superintendent was present upon the spot. The defendant urges upon us that the bridge was built by bridge builders of national reputation, that the number of persons upon it on the day of the accident was less than the number which it was constructed to hold, standing head to head. That it was fully as strong the day it broke as it was the day it was placed in position. That it had been in position for eight years with crowds passing over it, and not a single accident had occurred during the whole time.

It is true that the bridge had been in position for a number of years without accident, but this particular argument loses much of its force from the fact that the bridge had been taken from the position which it had originally been placed in, for the purpose of renewing and repairing the wooden piling under and about it and that it was only thrown open for travel over it on the day before the accident. It is more than probable that when replaced in position, its bearings were not properly adjusted or that some of the pilings were either faulty in position, or were otherwise defective. It was certainly imprudent to put its safety to the test under the new and dangerous conditions under which (when tested) it gave way. From the evidence it would appear that when the ferry boat struck the pontoon bridge the blow forced the latter against the line of piling. That at that time the pontoon bridge was loaded with passengers, as was also the iron bridge at its lower end. That as the boat struck the pontoon, a bar which had been thrown across the lower end of the iron bridge (to prevent persons from moving out of it) was withdrawn and the crowd on the wagon gangway, that upon the pontoon, and that upon the passenger bridge, all moved forward rapidly to get upon the boat. That as the boat struck the pontoon the passenger bridge was raised by the concussion and simultaneously the forward movement of the different crowds occurred, followed at once by the breaking of the bridge in the middle.

The handling of the ferry-boat, the construction of the new piling, the replacing of the iron bridge, the crowding of persons upon the wagon-way and upon the iron bridge, particularly upon the latter,

were all matters under the direct control of the defendant. From faulty action, as well as faulty inaction of the defendant, in respect to these matters, or some of them, in concurrence, possibly, with a rush on the part of the persons upon the wagon and passenger approaches, the bridge, on which plaintiff's wife was standing, was caused to break, and defendant became responsible for the same.

It is no anwer in the case to say that defendant had no control over the conduct of the crowd, for, in the first place, they should not have been permitted to be in such numbers upon the gangway, and, in the next place, the parties who were standing on the upper portion of the iron bridge at the time of the accident (and plaintiff's wife was one of them) would not have been there had the man at the turnstile turned the check upon it as he should have done when danger became apparent to him. A simple *suggestion*, even, of danger, to a timid woman, would have caused her to desist from entering. She could not be expected to have anticipated or to have realized any sooner than she did, the possibility of danger in view of the direct invitation of defendant's employee to her "to pass in," and his receipt of her fare in so doing. Under plaintiff's prayer on appeal for an increase of the amount of damage awarded, we have examined carefully the testimony bearing on what should be the *quantum* of damages to be accorded. It is one of those cases where physical pain and suffering constitute the principal factors. While it is quite probable we would have accorded plaintiff heavier damages had we been called upon to pass on this question in the first instance, we do not feel warranted in reversing, on this point, the judgment appealed from.

It is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby affirmed.

MR. JUSTICE BLANCHARD: I concur in the opinion of the majority of the court that plaintiff should have judgment, but dissent as to the mere affirmance of the judgment appealed from, believing the same should be increased to one thousand dollars.