(90 South. 512)

No. 23274.

## HOPKINS v. NEW ORLEANS RAILWAY & LIGHT CO.

(Jan. 3, 1921. On Rehearing, Jan. 2, 1922.)

*(Syllabus by Editorial Staff.)*

1. **Appeal and error** ⬤⟝999(1)—**Verdict under erroneous instructions entitled to little weight.**

In an action for injuries to a street car passenger, a verdict for defendant is entitled to but little weight when the charge was in the most general terms, failed to define the duties of the carrier to the passenger, and erroneously instructed that the burden of proof was on the passenger.

2. **Carriers** ⬤⟝280(1)—**Strictest diligence required by carrier of passengers.**

The carrier is bound to exercise the strictest diligence in receiving passenger, conveying him to his destination, and setting him down safely that the means of conveyance and circumstances will permit.

3. **Carriers** ⬤⟝316(1)—**Have burden of proving cause for failure to set down passenger safely.**

It is sufficient for a passenger suing on a contract for safe passage to show that he was not set down safely at his destination to throw the burden of explanation on the carrier, and it is for the carrier to prove what negligence and whose prevented the fulfillment of the contractual obligation.

4. **Carriers** ⬤⟝344—**Burden on carrier to prove passenger's contributory negligence.**

The burden is on the carrier to establish affirmatively the contributory negligence of the passenger.

5. **Carriers** ⬤⟝303(6)—**Duty of street car company to prevent obstruction of platform by objects endangering alighting passengers.**

A street car company owes to its passengers the duty to prevent the obstruction of the platforms by baskets or other objects which would endanger passengers when alighting.

6. **Carriers** ⬤⟝318(9)—**Evidence held not to sustain carrier's contention passenger fell after she had safely alighted.**

In an action for injuries to a passenger who claimed she fell from a street car when her skirt caught on a basket which another passenger had set on the platform near the steps, thereby tripping her and throwing her to the ground, evidence *held* not to sustain the contention of the carrier that plaintiff had reached the ground in safety and thereafter fell from some unknown cause.

7. **Continuance** ⬤⟝35—**Statements admitted to avoid continuance are entitled to same weight as foreign testimony.**

Where defendant's counsel to avoid a continuance admitted that an absent witness would, if present, testify as stated by plaintiff, such statement is entitled to the same weight as would be the testimony of the witness given under oath on the stand.

8. **Damages** ⬤⟝132(3)—**$10,000 awarded for injuries causing curvature of the spine.**

In an action for injuries to a woman 58 years of age caused by a fall from the street car, which caused curvature of the spine so as to cripple her for life and permanently incapacitate her to earn a livelihood, a judgment for $10,000 damages rendered.

Monroe, C. J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by Augusta D. Hopkins against the New Orleans Railway & Light Company. Judgment for defendant, and plaintiff appeals. Reversed, and judgment rendered for plaintiff, on rehearing.

Paul W. Maloney, of New Orleans, for appellant.

Dart, Kernan & Dart, of New Orleans, for appellee.

DAWKINS, J. Plaintiff seeks damages of the defendant company for personal injuries alleged to have been received through its fault and negligence while alighting from a street car. She alleges that, when she went to leave the car at her destination, the platform over which she had to pass was crowded with passengers, one of whom had been permitted by the conducter to place a fish basket in her path to the steps, and that as she attempted to step down from the platform to the steps, the rear part of her skirt caught on the basket, causing her to trip and fall to the shell-covered ground some two or three feet below, with such force that severe injuries were inflicted upon her left side, neck, shoulder, and hip, from the effects of which she developed curvature of the spine, and that her condition is now such that she is totally and permanently disfigured and disabled from earning a living. She claims the sum of $50,000.

Defendant admits that plaintiff was a passenger upon its car, but otherwise denies the allegations of fact. Defendant further avers that plaintiff fell after she had safely alighted from the car, and that the same was due entirely to her own fault and carelessness, and for which it was in no way responsible.

There was a trial before a jury, which gave a verdict for defendant and from a judgment pursuant thereto plaintiff brings this appeal.

### Opinion.

The issues of this case turn almost entirely upon questions of fact. The defendant, as a carrier of passengers, undoubtedly owed the plaintiff the duty of transporting and landing her safely at her destination, and this included clear passageway and safe means to alight. It could not permit its platform and exit to be obstructed by objects which were reasonably calculated to trip or cause injury to its passengers; and the burden rests upon the carrier to show, so long as the relation

exists, that injuries received by the passenger were not due to its fault or those over whom it has control. Clerc v. M. L. & T. R. R. & S. S. Co., 107 La. 370, 31 South. 886, 90 Am. St. Rep. 319; Le Blanc v. Sweet, 107 La. 355, 31 South. 766, 90 Am. St. Rep. 303.

The plaintiff, sworn as a witness in her own behalf, says that as she passed out of the car onto the platform a man was standing next the outer side of the vestibule near the exit which she had to use with a large wicker fish basket about two feet long in front of him, and leaving a narrow passageway for her to alight; that she avoided contact with the basket as she passed, but as she put her foot down to the step of the car the lower and rear portion of her skirt caught on the basket and caused her to trip and fall to the ground.

In support of plaintiff's version of what took place there appears the following:

A colored witness by the name of Armant was summoned in her behalf, but at the time he was called to testify could not be found, and defendant's counsel consented that a statement signed by Armant and given plaintiff's counsel might be filed in evidence, in order to avoid delay in the trial, and this was received in lieu of his testimony. The statement reads:

"William Armant, residing at No. 2731 Lepage street, New Orleans, La., says: That he was a passenger on Spanish Fort train on or about the 13th of September, 1916, at about 8:30 a. m. He was standing on the platform with two or three other men on the trailer behind motorcar, and there was a man standing on the platform on the right-hand side near the step of car with a fishing basket in front of him. I saw a lady come from the inside of car where I was standing to the platform in order to get out. There was not much space for any one to walk on account of myself and other men and man with fishing basket standing in front of him. The lady had just put one foot from the platform to the step of the car when her skirt was caught at the bottom on the fishing basket and she was thrown to ground on the shell walk below. I got off the

car and later joined by Mr. Cuccia and others, and I assisted the lady to her feet with the aid of the conductor. She looked to me like she was knocked out. She said to me that I am hurted, and held her side and started to limp. The train was about to pull out, and I got on the train, and the lady was left on the road.

"[Signed] W. Armant."

And Robert Blatcher (colored), sworn on behalf of defendant, in response to a question by defendant's counsel, said:

"A. Well, when she got on the platform, a basket was setting on the platform caught her dress. It was loose. It got loose before she hit the step, and when she hit the step—before she hit the step, the basket come aloose from her dress. The car was stopped still; then she got down from the step and got safely down on the ground, and the car started off, and the car was about five feet when she fell, and the conductor, he stopped the car all of a sudden and got down and went and picked her up and helped her to her feet, and he turned her aloose, and she walked by herself."

And again on cross-examination his testimony was in part as follows:

"Q. Now, where was that basket, standing alongside of you?

"A. On that side of me; yes, sir (indicating).

"Q. What side?

"A. The opposite side of me, on the left side, the way I was standing.

"Q. In other words; it was nearer the step than you were?

"A. Well, yes, sir; it was.

"Q. You saw the lady's dress get caught on the basket, you said.

"A. Yes, sir.

"Q. You don't know what part of the dress got caught, do you?

"A. No, sir; it looks like the end of it, down at the tail.

"Q. Who did that basket belong to?

"A. Well, I couldn't say exactly who it belonged to, but the gentleman what was right opposite me, the colored fellow, he caught hold of his basket and pulled it back after it was loose from her dress.

"Q. You saw it get caught on the dress, all right, didn't you?

"A. Yes, sir.

"Q. Now, wasn't that basket on the right-hand side of the lady as she was getting off?

"A. On the right-hand side?

"Q. Yes?

"A. No, sir.

"Q. You are sure about that?

"A. It was on the left-hand side, I am sure."

It is also conceded by all witnesses, in fact admitted in the answer, that plaintiff did fall; the point of difference being as to whether she fell while alighting, and as the result of her skirt having caught on the basket, or after she had reached the ground safely and at a time when it was impossible for the basket or anything else on the platform to have contributed to the fall.

On behalf of defendant a fish basket was produced in court by the colored witness to whom it belonged and who swore that it was the same one which he had on the car at the time of the accident. It measured $17\frac{1}{8}$ inches in length by $12\frac{1}{4}$ inches in width over the top, was $8\frac{5}{8}$ inches high, and 14x9 inches at the bottom. The lid and upper portion were made of wicker, and the bottom was composed of small wire netting.

This colored witness said that the basket was placed close up against the outer wall of the vestibule on the platform, near the opening or gate leading from the trailer on which plaintiff was riding to the motorcar just ahead (the train being composed of a motorcar and one trailer); that it, the basket, was on the same side of the gate as the step from which plaintiff alighted, but that her skirt did not catch the basket, and she fell after safely reaching the ground. He also denies having replaced the basket after it was moved by plaintiff's skirt as testified to by the witness Blatcher and quoted above. Both this witness and Blatcher, according to the testimony, were standing on the platform of the trailer, and in a position to see what took place.

The conductor of defendant's train had, just before the stop was made for plaintiff to alight, crossed over from the platform of the trailer, from which plaintiff descended,

to that of the motorcar ahead, and says that he saw her safely reach the ground, and that he gave the signal for the car to proceed, and after plaintiff had moved a few feet away from the car she stumbled and fell; that he signaled the motorman to stop, got down, and, with the assistance of another, helped her to her feet. He further denies that her skirt caught on the basket, but we are very doubtful, to say the least, that if the basket was on the side of the platform where all of the witnesses place it, with varying degrees of proximity to the step, it was possible for him to have seen it or what happened with respect to plaintiff's skirt, for the wall of the vestibule, extending up about waist high, was between him and the basket, and we believe he would have had to be either right up against this wall, or to have craned over in order to do so.

The witness Blatcher, heretofore referred to and quoted from, says, as the quotation shows, that he was also on the platform of the trailer in a position to see everything that happened, and that the plaintiff's skirt did not adhere to the basket or cause her to fall, but that she cleared the car and fell under the circumstances detailed by defendant's other witnesses.

All of the witnesses of defendant heretofore mentioned say they have no recollection of having seen the witness Armant (who had disappeared when called as a witness) on the car.

A white witness for defendant named Robert Burr says that he was in charge of a switch at or near the point where the car had stopped, and at the time was standing near the door of the "operating room" at a point about four or five feet from the center of the motor, on the same side that plaintiff alighted from, looking in that direction; that she landed safely, and fell after proceeding a short distance from the car.

The motorman, Seruntine, also sworn as a witness, says that his attention was first attracted to the scene by the fact that the conductor gave him a signal of two bells to go ahead, and immediately one to stop; that he looked back through the motorcar and out the side windows and saw the conductor and others helping the lady to her feet.

All of the witnesses who were interrogated on the point say that the signal to go forward was given, and that it was promptly followed by one to again stop.

The accident happened about 8 a. m. Plaintiff went on to her destination, came back to Canal street on the same train on its return trip from Spanish Fort, and called upon the assistant claim agent of the defendant company at about 10 o'clock a. m. of the same day, and as to what passed at this interview the agent says:

"Q. Now, what did she say to you when she called?

"A. And she stated to me that on that morning she had boarded a Spanish Fort train, 509, which had left Canal and Rampart streets about 8 o'clock; that, on the train reaching the West End road and Adams avenue, the train had stopped for her to get off; in alighting from the train, she had fallen. She says she didn't know what caused her to fall. She said some one on the train said it was a fisherman's basket. She also told me that in alighting she had held on to a fishing pole that was on the platform, and on reaching the step she had let go that fishing pole and she was going to the ground then, and it was then she had fallen; that in the fall she had scratched the palm of her right hand and she had bruised her right elbow and she had soiled a dress. She had on a tan dress which is called a mercerized poplin."

The plaintiff denies that she said she did not know what caused her to fall, but claims that she detailed then to the agent the circumstances substantially the same as on the trial. From the character of her replies to questions under examination as a witness, and from difficulties which she had with physicians, etc., she appears to be of a somewhat petulant nature, and for this reason,

perhaps, did not impress the jury very forcefully with her testimony, although we are impressed that her intentions were good. Then, again, the unexplained disappearance of her main supporting witness also probably weakened her case before the jury. There is nothing in the record to show that the condition of the ground on which she landed was such as was calculated to cause her to fall; while the reason and circumstances which she details would appear, if true, to lead naturally to the result which she claims.

However, it does not seem to us altogether reasonable that the conductor would have given the signal to proceed, if she had been thrown to the ground from the steps as she says, for in that event a situation would have been produced requiring his immediate attention and assistance to the lady, if he was watching her movements, as we, in the absence of proof to the contrary, assume him to have been; and it is further hard for us to conceive, if he did see her fall as stated, that he deliberately signaled to go forward and then immediately followed with one to stop.

The condition of our mind, after carefully analyzing and considering all the evidence, is such that we cannot say, without some knowledge of the credibility of the witnesses, just what the true facts were, and we think that they might easily have been resolved one way or the other. In such circumstances we are constrained to accept and rely upon the judgment of the jury, who saw and heard the witnesses testify, and would not feel justified in reversing them on such a close question of fact.

As pointed out in the beginning, the issue of fact thus found adversely to plaintiff is determinative of the case.

For the reasons assigned, the judgment appealed from is affirmed at the cost of the appellant.

## On Rehearing.

LAND, J. Plaintiff, the widow of Charles Hopkins, has instituted this suit to recover from defendant company damages in the sum of $50,000 for personal injuries alleged to have been received by her through the negligence of said company; said damages being itemized as follows:

"For pain and suffering $20,000; for loss of earning capacity, $6,500; permanent disability, $23,500."

On the morning of September 13, 1916, plaintiff was a passenger on a Spanish Fort train on her way to Adams avenue, where she was going to deliver some fancywork to a customer. Plaintiff alleges:

"That as said train, approached Adams avenue the conductor passed through the trailer where she was seated and called out that the next stop was Adams avenue, and that he went into the car ahead; that said train was stopped at Adams avenue, and, as petitioner approached the platform, she noticed that it was congested by a passenger standing on the right-hand side, and a large fishing basket was in front of him, leaving but a small space through which petitioner had to pass, and that petitioner was prudent and careful as she went by, but as she put her right foot from the platform onto the step of said car, and was about to put the other foot to the ground, the lower right-hand side of her dress, just above the hem, caught in the basket, and the lower portion thereof wrapped around her ankles, causing a sudden jerk which threw her heavily to the ground, which had been shelled for a walk, injuring her severely on the right side of the neck, shoulder, chest, and hip; that the conductor had no right to thus permit the platform to be obstructed, and he was in the car ahead and did nothing to assist petitioner to alight, although he knew that the basket and the passenger had obstructed the platform, and he permitted it to be done with his sanction as aforesaid."

Defendant company denies all the allegations of plaintiff's petition, but avers:

"That on the 13th of September, 1916, between 8:30 and 9 o'clock a. m., a lady who gave her name as Mrs. A. Hopkins was a passenger on a Spanish Fort train, and, as said train stopped at Adams avenue and West End boule-

vard, the said Mrs. Hopkins alighted therefrom; that, after she had stepped from the car to the ground, she fell, sustaining some slight injury to her right side."

Further answering, respondent avers:

"That at the time the said Mrs. Hopkins fell the train was at a stop, and respondent had no knowledge of what caused the fall, but believes, and, believing, so charges, that the fall was due to the awkwardness of the passenger, or to her failure to take proper care in looking where she stepped, or to some other cause over which respondent had no control, and for which it is in no way responsible."

[1] The case was tried by jury, which returned a verdict for defendant. We think, however, that but little, if any, weight should be attached to the verdict of the jury in this case, under the circumstances. The charge of the court was couched in the most general terms. It failed to define the duties of a carrier to a passenger, and erroneously instructed the jury that the burden of proof was on the plaintiff, the passenger, which would necessarily include the burden of proving that plaintiff was a passenger, that she was injured, and that she was without fault; and this too, in face of the special defense set up by defendant company in its answer that plaintiff was injured by a fall after she had alighted from the car.

The charge stated to the jury that the case apparently resolved itself into a question of fact. Standing out in bold relief is the statement in the charge:

"The fact that a fishing basket was on the platform of the car, in full view, is not of itself negligence on the part of the railway company."

When the jury, after deliberating on the case, returned for further instructions, the general charge was re-read to them, and, after its conclusion, one of the jurors inquired of the court whether the presence of the basket on the platform of the car constituted contributory negligence on the part of the defendant. The court in reply stated that of itself it did not constitute negligence on the part of the defendant.

The jury evidently were led to believe, from this instruction thrice repeated, without further explanation, that defendant company was not guilty of negligence, although the testimony shows that the conductor was aware of the presence of this fishing basket and its proximity to the door through which passengers had to alight.

The court delivered no charge to the jury as to the plain duty of defendant company to keep its aisles and platforms clear so as to permit passengers to pass out of the cars with safety. The jury evidently were misled by the charge, because of its failure to give the law of the case fully, as should have been done.

[2, 3] Reduced to the simplest form, the rule may be stated to be that the carrier—

"is bound to exercise the strictest diligence, in receiving a passenger, conveying him to his destination, and setting him down safely, that the means of conveyance employed and the circumstances of the case will permit.

"There is a broad difference, it may be remarked, between the obligation of a carrier to a passenger and his obligation to a third person complaining of a tort; the burden of proof in the latter case, save where otherwise provided by statute, resting upon the complainant to establish both the injury and the negligence which caused it; whereas, * * * it is sufficient * * * for the passenger suing on a contract for" safe passage "to establish the contract and to show that he has not been safely set down at his destination," to throw the burden of explanation on the carrier. It is then for the carrier, and not the passenger, to show what negligence and whose prevented the fulfillment of the contractual obligations of the carrier." Le Blanc and Wife v. Daniel Sweet et al., 107 La. 355, 31 South. 766, 90 Am. St. Rep. 303; Am. & En. Enc. of Law (2d Ed.) vol. 5, p. 558; Lehman v. R. R. Co., 37 La. Ann. 707; Turner v. V., S. & P. R. R. Co., 37 La. Ann. 648, 55 Am. Rep. 514; Summers v. C. C. R. R. Co., 34 La. Ann. 145, 44 Am. Rep. 419; Peniston v. R. R. Co., 34 La. Ann. 777, 44 Am. Rep. 444; Julien v. Captain and Owner of Steamboat Wade Hampton, 27 La. Ann. 377;

Patton v. Pickles, 50 La. Ann. 857, 24 South. 290; Moses v. R. R. Co., 39 La. Ann. 649, 2 South. 567, 4 Am. St. Rep. 231.

In Patton v. Pickles, 50 La. Ann. 864, 24 South. 293, referring to the relations between a common carrier and its passengers, this court said:

"The contract between the parties is one which from time immemorial has imposed upon the obligor exceptionally severe obligations. Safe carriage is not merely an incident of the contract, but it is its very direct object."

[4, 5] Again, in the case of Clerc v. Railroad & Steamship Co., we said:

"We do not think that a railroad company can by its own act or that of one for whose acts it is responsible itself injure one of its passengers, and then throw upon him the obligation of disproving contributory negligence," barring him from recovery of damages.

"In such a case the carrier must establish affirmatively the acts on the part of the passenger which it claims brings him under the operation of the rule of contributory negligence, barring him from recovery of damages. Kennon v. Railroad Co., 31 La. Ann. 1604, 26 South. 466; * * * Lampkin v. McCormick, 105 La. 418, 29 South. 952; and Kird v. Railroad Co., 105 La. 226, 29 South. 729. See Chaffee v. Railroad Corp., 104 Mass. 108; Hempenstall v. Railroad Co., 82 Hun, 285, 31 N. Y. Supp. 479; Archer v. Railroad Co., 106 N. Y. 589, 13 N. E. 318; Fett. Carr. Pass. §§ 127, 130, 151."

107 La. 382, 31 South. 891, 90 Am. St. Rep. 319.

"The negligence of a common carrier in carrying the passengers includes his negligence in all of the departments of his undertaking," and "in everything, indeed, necessary to the safety of the passenger when he himself is not at fault."

Clerc v. Railroad & Steamship Co., 107 La. 376, 31 South. 889, 90 Am. St. Rep. 319.

It is not within the power of a passenger to prevent either congestion of passengers on the platform of a coach or its obstruction by baskets, bundles, or other objects. This responsibility rests upon the carrier alone. It is his duty to furnish a safe and unobstructed exit from his cars to the passenger.

[6] The defendant company in its answer does not charge that plaintiff was injured by any fault of her own by failing to exercise ordinary care or prudence in alighting from its car, but merely avers that she was injured by a fall after she had stepped from the car to the ground, and "that defendant had no knowledge of what caused the fall, and, believing, so charges, that the fall was due to awkwardness of the passenger, or to her failure to take proper care in looking where she stepped, or to some other cause over which respondent had no control and for which it is in no way responsible," all of which is purely conjectural as to any good reason for her falling at all, after she had alighted from the car.

In our former opinion we say:

"There is nothing in the record to show that the condition of the ground on which she landed was such as was calculated to cause her to fall; while the reasons and circumstances which she details would appear, if true, to lead naturally to the result which she claims."

In addition to this the severe injuries which plaintiff received by the fall, producing curvature of the spine, lowering of the right hip, a marked bulging of the left chest, to say nothing of a locomotion so impaired that plaintiff can walk with difficulty only a short distance, when she is compelled to stop and rest, and frequent suffering from a condition of extreme nervousness—all of this strongly indicates that it is not at all probable that her physical condition resulted or could have resulted from a mere fall while on the ground, as testified to by defendant's witnesses.

As defendant company avers in its answer "that, after she had stepped from the car to the ground, she fell, sustaining some slight injury to her right side," it cannot be consistently urged before this court that the grave condition of plaintiff was the result of such a fall.

With no satisfactory cause shown by the evidence in the case as to why she fell after alighting from the car of defendant company, and with injuries of such a serious and permanent nature as to indicate a fall with great force, we naturally conclude that these circumstances tend to corroborate her testimony and that of her witnesses that she fell from the steps of the coach and was jerked violently to the ground by her dress catching on the fishing basket in the vestibule and wrapping around her ankles.

For these reasons we are not favorably impressed with the testimony of defendant company that she fell after the car had stopped and she had already alighted, especially as the testimony of the conductor in charge of the motorcar and trailer is very questionable.

We say in our former opinion:

"The conductor of defendant's train had, just before the stop was made for plaintiff to alight, crossed over from the platform of the trailer, from which plaintiff descended, to that of the motorcar ahead, and says that he saw her safely reach the ground, and that he gave the signal for the car to proceed, and, after plaintiff had moved a few feet away from the car, she stumbled and fell; that he signaled the motorman to stop, got down, and, with the assistance of another, helped her to her feet. He further denies that her skirt caught on the basket, but we are very doubtful, to say the least of it, that if the basket was on the side of the platform where all of the witnesses place it, with varying degrees of proximity to the step, it was possible for him to have seen it, or what happened with respect to plaintiff's skirt, for the wall of the vestibule, extending up about waist high, was between him and the basket, and we believe that he would have to be either up against this wall or to have craned over it."

A witness who can see skirts and baskets through the wall of a vestibule with the naked eye possesses a very penetrating and phenomenal vision, we must admit such testimony, at best, is a poor prop to bolster up a defense which in itself is naturally weak, as it assumes a slight injury to the plaintiff from the fall on the ground near the car, after she had alighted, and fails utterly to account for her distressing condition of being made a cripple for life and a physical wreck from such fall.

The conductor is therefore eliminated from the case, as far as his testimony is concerned. The next witness of defendant who swears that plaintiff's dress did not get caught on the basket is one Adolph Augustin, who claims to be the owner of the basket which was on the platform at the time of the accident. The testimony of Adolph Augustin is flatly contradicted by the plaintiff and by the following affidavit:

"William Armant, residing at No. 2731 Lepage street, New Orleans, La., says: That he was a passenger on Spanish Fort train on or about the 13th of September, 1916, at about 8:30 a. m. He was standing on the platform with two or three other men on the trailer behind motorcar, and there was a man standing on the platform on the right-hand side near the step of the car with a fishing basket in front of him. I saw a lady come from inside of car where I was standing to the platform in order to get out. There was not much space for any one to walk on account of myself and other men and man with fishing basket standing in front of him. The lady had just put one foot from the platform to the step of the car when her skirt was caught at the bottom of the fishing basket and she was thrown to the ground on the shell walk below. I got off the car, and later joined by Mr. Cuccia and others, and I assisted the lady to her feet with the aid of the conductor. She looked to me like she was knocked out. She said to me that I am hurted and held her side and started to limp. The train was about to pull out, and I got on the train, and the lady was left on the road.

"[Signed] W. Armant."

[7] Counsel for the defendant admitted that, if the witness William Armant, who was summoned, but who did not report, was sworn, he would testify as stated in the affidavit signed by him but did not admit that these are the facts. These admissions were made in order to avoid a continuance in the case; therefore the statements made by Armant are to be considered by the court as

if made by him under oath on the witness stand, and to be given the same effect.

Defendant's witness Adolph Augustin is also flatly contradicted by Robert Blatcher, also a witness for defendant, who states that he was on the platform of the trailer at the time of the accident, standing on the left-hand side, with back against the front dash-board of the car; that there were four men on the platform; that the colored man who had the basket was standing opposite to him with his back against the wall of the car and to the left of the car door, as you come out upon the platform from the car; that the basket was to his left against the dashboard; that when plaintiff got onto the platform, the basket sitting on the platform "caught her dress, and that plaintiff's dress got loose before she hit the steps."

The witness testified as follows:

"Q. You don't know what part of the dress got caught, do you? A. No, sir; it looks like the end of it, down at the tail. Q. Who did the basket belong to? A. Well, I couldn't say exactly who it belonged to, but the gentleman who was right opposite me, the colored fellow, he caught hold of his basket and pulled it back after it was loose from her dress."

The conductor and Adolph Augustin both being discredited in their testimony that plaintiff's dress did not catch on the basket, we conclude that a fair preponderance of the testimony in this case is on the side of plaintiff that her dress caught on the basket as she was about to step off the platform, as she is corroborated by the testimony of William Armant and of Robert Blatcher.

In addition to this, Robert Burr, a witness for defendant company, testifies as follows:

"Q. Did you see her fall? A. Yes, sir. Q. Where was she when she fell? A. She was on the ground when she fell. Q. Did you see what caused her to fall? A. The only thing I seen to cause her to fall, there seemed to be a little trip, seemed to be from her dress. Q. Just explain how that was? A. Why, she stepped down from the platform to the step, and from the step onto the ground, and just as she en-tered the ground she tripped somewhere from her dress, and she fell forward throwing her right hand out. Q. Could you see on the platform at the time from where you were standing? A. Yes, sir; could see full view. Q. Could you see whether her dress caught on anything on the platform or not? A. Her dress didn't catch on the platform, because she was off the car when she fell."

The witness was on the ground near the trailer, but admitted on cross-examination, when asked if he could see over the dash-board, that he could see only the corner, "because it was a little too far to see right through it, as the irons were there." With this obstruction to the view and with plaintiff in the door of the car descending to the ground, it was not possible for the witness to see whether the tail of plaintiff's dress caught on this basket or not as she was in the act of alighting. This witness, however, would have the court believe that plaintiff's dress, which reached only to her shoetops, tripped her, without any cause, as she landed on the ground, which was perfectly level.

Plaintiff saw the basket on the platform and was careful enough not to rub against it as she passed. It was only when plaintiff had placed one foot on the step, and was in the act of putting down the other on the ground, that her skirt caught from the back and tripped her.

As it is 15½ inches from the top of the platform to the step, it is evident that the rear of plaintiff's dress, which reached to her shoetops, touched the floor of the platform for the first time, and came in contact with the basket, which necessarily must have been very near the right edge of the platform, where plaintiff was in the act of getting off. It may be that, because her dress caught on the basket at the moment of her descent from the steps, it may have appeared to some of the witnesses that she tripped and fell only after she had reached the ground.

[8] The plaintiff was 58 years old at the

time this suit was filed in September, 1917. She is crippled for life and permanently incapacitated to earn a livelihood. She has suffered much pain, and her power of locomotion is greatly impaired.

Taking into consideration all of these circumstances, we are of the opinion that damages in the sum of $10,000 will meet the ends of justice in this case.

It is therefore ordered, adjudged, and decreed that our former judgment be set aside, and that the judgment appealed from be annulled, avoided, and reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff and against the defendant company in the full sum of $10,000, with legal interest from judicial demand until paid and all costs.

MONROE, C. J., dissents.