139 So.2d 7 (1962)
Mrs. Mary M. JOHNSON
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. 281.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1962.
Rehearing Denied April 2, 1962.
Certiorari Denied May 18, 1962.
*8 Alvin R. Christovich, William W. Ogden, New Orleans, for defendant-appellant.
Midlo & Lehmann, Rene Lehmann, New Orleans, for plaintiff-appellee.
Before REGAN, YARRUT and SAMUEL, JJ.
SAMUEL, Judge.
Plaintiff filed this suit in tort to recover damages for the death of her husband. She alleges that on May 17, 1959, at about 9:30 P.M., the deceased, Philip Johnson, was a passenger on a defendant bus (defendant is a common carrier in the City of New Orleans) being operated on Washington Avenue; that defendant was negligent in discharging the deceased at a dangerous place next to the Washington Canal and, as a result of such negligence, he fell into the canal and was killed.
Defendant answered, admitting that the deceased was found on a concrete ledge of the Washington Canal, but denied that his injury or death was caused through any fault or negligence on its part and alternately pleaded contributory negligence on the part of the deceased, alleging that he was intoxicated.
The trial court rendered judgment in favor of plaintiff for $3,500.00 plus an additional $648.00 for funeral expenses. Defendant has appealed. Plaintiff has answered the appeal seeking an increase in the $3,500.00 award.
The following facts were found by the trial court: Johnson was a fare paying passenger on a defendant bus operated by a defendant employee; he entered the bus in an intoxicated condition; he was discharged from the bus a distance of 112 feet beyond the regular bus stop on South Genois Street; the terrain at this location was unsafe for such disembarkment; Johnson was not living with his wife, the plaintiff, and he had no steady income. The court was of the opinion that, as a result of his intoxication, Johnson was incapable of being contributorily negligent.
Defendant was not able to offer any direct evidence on the question of how the accident happened. However, from transfers which had been obtained by the decedent's sister, Ida Mae Perry, it was able to determine the two drivers of the particular bus on the trip during which the accident is alleged to have occurred. The first of these, Norris J. Rabalais, was the man who was driving at the time decedent entered the bus, and the other, Leslie L. Smith, who boarded the bus and relieved Rabalais as driver during the course of the trip, was operating the bus at the time of the decedent's discharge therefrom. Rabalais testified that he had no recollection of Johnson entering the bus and Smith testified that he had no recollection of making an unscheduled stop or of Johnson getting off. The only witnesses who appeared at the trial and testified to the facts involved in the accident from the time Johnson boarded the bus until he was injured were the decedent's sister, Ida Mae Perry, and her husband, Earl Perry, both plaintiff witnesses. The trial judge accepted their testimony as to how the accident happened and so do we.
It took place on a Sunday. Johnson had spent that week end with his sister, Ida Mae Perry, and her husband. At about 5:00 or 6:00 P.M. Johnson, the Perrys, husband and wife, and their four small children went to visit Earl Perry's sister at her home, also in the City of New Orleans. They left the sister's home about 9:00 P.M. for the purpose of returning to the Perry residence. At that time Johnson was intoxicated.
*9 The group boarded a bus at Loyola Street and Louisiana Avenue. Ida Mae Perry took care of paying the fare and at the same time obtained transfers, while the remainder of the group, with the youngest child being carried by Perry, boarded the bus and seated themselves in the back. Johnson sat by himself in the third to last seat of the bus, three of the children sat immediately in front of him, and the Perrys, with the youngest child, sat together in a seat of their own. During the ride Johnson spoke to no one and simply sat quietly in his seat, apparently dozing.
When the bus stopped at their corner, which was South Genois Street and Washington Avenue, the Perrys and the children, together with other passengers, got off. As she was leaving Mrs. Perry called to Johnson to come with them. But Johnson was slow in getting up and the disembarking passengers had left the bus and the exit door had closed before he got out of his seat. The bus was leaving the corner when Johnson pulled the cord signaling the driver that he desired to get off. The bus was driven further along Washington Avenue, a distance of 112 feet beyond the stop at which the other passengers had disembarked and across an intervening railroad track, and made an unscheduled stop to allow Johnson to get off. Johnson then got off safely and the bus proceeded on its way. The point at which Johnson disembarked, as was also true of the regular South Genois bus stop where the other passengers had gotten off, was near a drainage canal.
Immediately after the bus had departed Johnson turned as if to walk into Washington Avenue and as he did so he stumbled backward and fell over the canal edge to a concrete ledge below. He was later taken from the canal by the police and brought to Charity Hospital where he died the following morning from a head injury received in the fall.
The bus was operated by one person who occupied the driver's seat. Entry into the bus was by means of a front door just opposite the driver. Exit therefrom, by all of the disembarking passengers at the South Genois stop and by Johnson 112 feet beyond, was through another or back door behind the driver and towards the rear of the bus. The driver, of course, sits at the extreme front and on the left side of the bus and both doors are on the right side.
Common carriers are required to exercise strictest diligence in receiving a passenger, conveying him to his destination, providing him with a safe place of exit, and setting him down safely, and the burden of proving that this obligation has been met is upon the carrier. Gaines v. Aetna Casualty & Surety Co., La.App., 110 So.2d 851; Cusimano v. New Orleans Public Service Inc., 170 La. 95, 127 So. 376; Hopkins v. New Orleans Railway & Light Co., 150 La. 61, 90 So. 512, 19 A.L.R. 1362. However, this burden of proof can be discharged by showing that the injury occurred through no negligence on the part of the carrier (Cusimano v. New Orleans Public Service Inc., supra) and that it has not been guilty of an omission of any act of prudence, care or caution which might have resulted in avoiding the infliction of injury upon the passenger (Hopper v. Shreveport Railway Co., La.App., 51 So.2d 845).
The test as to the safety of the place where the passenger was allowed to disembark is simply whether or not the place itself was reasonably safe, and the fact that it was not a regular or scheduled stop for the common carrier does not, in itself, constitute negligence. Crawley v. City of Monroe, La.App., 26 So.2d 493; Freeman v. New Orleans Public Service Inc., 1 La.App. 600; Cloger v. New Orleans Ry. & Light Co., 143 La. 85, 78 So. 247.
The care which is required of the common carrier is higher when the passenger is intoxicated and this duty of special care applies not only when such intoxication is known to the carrier but also when that intoxication, by proper diligence, could have been known to the carrier's employees. *10 Bourgeois v. Toye Bros. Yellow Cab Co., La.App., 192 So. 379; Gates v. Bisso Ferry Co., La.App., 172 So. 829; Grenon v. New Orleans Public Service Inc., 10 La.App. 641, 120 So. 801.
As brought out by a survey of the area involved, the place at which Johnson got off the bus was a grassy strip, 11 feet 8 inches in width, between the Washington Avenue curb and the canal. The surface of the strip was slanted so that the top of the concrete side of the canal was 1 foot 9 inches below the level of the top of the concrete curb adjoining the Washington Avenue roadway the grade being approximately 15%. The regular bus stop just 112 feet away was the same width between the Washington Avenue curbing and the canal, but a portion thereof, nearer to the Washington Avenue curbing, was covered with white clam shells and its surface was comparatively level, the top of the concrete side of the canal being 3 3/8 inches below the level of the concrete curb.
While the trial court found as a fact that the terrain at the location where Johnson disembarked was unsafe, that court did not specify that it was unsafe for persons intoxicated or sober and we are of the opinion that the finding of fact was to the effect that the area was unsafe for Johnson in his intoxicated condition. From a careful examination of the entire record, and in this connection we particularly note that, as shown by their stipulated testimony, the two policemen from the police crash truck, who removed Johnson in a stretcher and who traversed the area, had no apparent difficulty in walking up and down and around the area, we conclude that the point at which Johnson disembarked was not an unsafe place for a normal, sober person.
We are thus presented with the problem of whether or not Johnson's intoxicated condition was known, or should have been known, to defendant's employees. If the answer to that question is in the affirmative, liability must follow; if the answer is in the negative, there can be no liability.
In the absence of such information from the first driver, it is quite clear that the second driver, under all the facts contained in the record, could not have known of Johnson's intoxication. For during all the time that Johnson and the second driver were both in the bus, except for the period during which the former arose from his seat and safely disembarked through the back door, Johnson had remained in his seat to the rear and there had been no incident or occurrence of any kind which would have attracted the driver's attention to him. The testimony of decedent's sister is that from where she was outside of the bus, after she had disembarked therefrom, she saw her brother ring the bell and walk to the exit door. Although she had a full opportunity to do so, she makes no mention of anything unusual about his progress, or manner of walking, etc., from his seat to the door and then from the bus to the grassy ground near the curb. The two, decedent and Smith, the second driver, where never close together. Thus if we are to say that defendant, through its employees, should have been aware of Johnson's intoxication, we must say this only of the first operator, Rabalais. Smith had no reasonable opportunity to make such an observation; he could not have discovered the intoxication by the exercise of reasonable diligence.
Four policemen, two who removed Johnson from the canal and brought him to the hospital, and two who investigated the accident, all of whom were very close to Johnson's person shortly after the accident happened, testified by stipulation that they smelled a strong odor of alcohol on his breath and about his person. It was also stipulated that properly qualified witnesses would testify that the alcoholic content of Johnson's blood, as shown by a sample taken during the course of an autopsy, was 28%. And it was further stipulated that an assistant coroner would testify that a man from whom such blood had been taken (the percentage of alcoholic content being somewhat higher if the blood sample would have been taken prior to death) would be *11 in a confused and dizzy state, have lack of concentration, lack of balance, would stagger and would have slurred speech.
Three of plaintiff's witnesses, his sister, her husband, and Eleanora Holley (Perry's sister), testified that Johnson had been drinking wine during the course of the day on which the accident happened and the last mentioned witness, Holley, also testified that Johnson staggered a "little bit" and that when the group left to return to the Perry residence her brother helped Johnson across Liberty Street and Louisiana Avenue in going to the bus. The brother in law, Perry, testified that Johnson was "kind of tipsy", and Johnson's sister, Ida Mae Perry, said that Johnson was "real drunk".
However, the actions of the sister throw considerable doubt on the testimony relative to the extent of Johnson's actual intoxication and actions insofar as appearances, and the extent to which they were discernable to third persons, are concerned. We gather from the record that she and her brother were extremely close and yet it is apparent that she did not feel that Johnson needed assistance in getting off the bus at the time she, her husband and the children disembarked. She got off the bus with the others leaving Johnson to fend for himself and it is clear that she expected him to get off with them and without assistance.
Since Johnson went to the back of the bus and thereafter remained in his seat nodding until he arose to get off, and since his sister took care of paying the fares and of obtaining the transfers, the only opportunity the first driver, Rabalais, had to observe Johnson's intoxication was when the latter entered the bus and passed the driver on his way to the back. There is no testimony or evidence in the record that Johnson received any assistance in boarding the bus or in getting to his seat, or that he had any difficulty in doing either, and we conclude that he accomplished these two things without assistance and without noticeable difficulty. Thus, except perhaps for the smell of alcohol, Rabalais could have had no reason to believe that Johnson was intoxicated and Rabalais could not have informed Smith, the subsequent driver of the bus, of anything unusual about Johnson's condition which would have required the exercise of added care because of knowledge of intoxication.
Nor can we find as a fact that Rabalais should have smelled alcohol on Johnson's breath or person in that brief interval during which Johnson passed that driver on his way to the back of the bus. Even if he did, simply the smell of alcohol emanating from a passenger is not sufficient to establish intoxication and place the carrier under the added burden of care required with regard to intoxicated persons.
The question is not what an average man might be expected to do when his blood had the same alcoholic content as Johnson's, our appreciation of the extent of the stipulated testimony of the assistant coroner; the problem is what Johnson himself actually did in boarding the bus and thereafter. Certainly we cannot hold that the bus drivers should have had any knowledge of Johnson's intoxication except such as was indicated by his actions, his conduct and the possible odor of alcohol while he was under their observation. We conclude that Johnson's intoxication was not known to the defendant and we are unable to conclude that such intoxication, by proper diligence, should have been known by the defendant's employees. To hold otherwise under the facts here involved would place far too heavy a burden on common carriers transporting passengers.
For the reasons assigned, the judgment appealed from is reversed and it is ordered that there be judgment in favor of defendant, New Orleans Public Service Inc., and against plaintiff, Mrs. Mary M. Johnson, rejecting plaintiff's demand at her cost.
Reversed.