84 So.2d 63 (1955)
Oscar J. ANDREPONT
v.
Dr. Alton OCHSNER.
No. 20423.
Court of Appeal of Louisiana, Orleans.
December 5, 1955.
*64 Adams & Reese, New Orleans, for defendants and appellants.
John E. Fleury, Gretna, Gordon Boswell, and Stanley E. Loeb, New Orleans, for plaintiff and appellee.
McBRIDE, Judge.
This is a suit brought by Oscar J. Andrepont against Dr. Alton Ochsner and the Aetna Casualty & Surety Company, the latter having been made a party defendant by supplemental and amended petition. The said surety company is the public liability carrier of Dr. Alton Ochsner, the Foundation Hospital, and Alton Ochsner Medical Foundation.
Plaintiff, who resides in St. Landry Parish, was referred to the Ochsner Clinic in New Orleans by his private physician for diagnosis of his complaints. He was first seen at the Clinic by a Dr. Bradford, who sent him to Foundation Hospital, Jefferson Parish, for treatment and surgery. After X-rays and various laboratory tests had been made, plaintiff was advised to have his left lung removed and he arranged with Dr. Alton Ochsner, a surgeon, to perform the operation, which is called a pneumonectomy.
Plaintiff entered the Foundation Hospital on March 14, 1949, and March 21 was selected as the date on which the operation was to be performed. On that morning he was taken to the induction room, where a Dr. David A. Davis undertook to administer an anesthetic. Dr. Davis started the procedure with sodium pentothal which is injected into the vein, and shortly thereafter proceeded to administer cyclopropane and oxygen to which was added a small amount of ether. Then plaintiff was conveyed to the operating room. From the evidence it appears that the anesthetic machine and operating table are first located in the induction room where the patient is administered the anesthetic and then is taken into the operating room where it is set in proper placement for use during the operation.
When the plaintiff was fully under the effect of the anesthetic, Dr. Ochsner proceeded to make the required incision in his left side and almost simultaneously there was an explosion and fire. What actually exploded was the gaseous mixture being administered to anesthetize the patient. As a result of the explosion and fire, nearly all of the glass part of the anesthetic machine was damaged, as well as the bottles holding the ether, and the re-breathing bag. The mask which is placed over the patient's mouth and nose was damaged or destroyed.
Of course, the operation was immediately halted, the incision in the patient's side was sutured, and a tracheotomy performed. The testimony shows that a tracheotomy is a slit in the patient's throat above the breastbone through which a small tube to facilitate breathing can be introduced.
It is not disputed that plaintiff was injured. He brought this suit against Dr. Alton Ochsner seeking to recover the sum of $50,000. The petition alleges that Dr. *65 Ochsner procured, furnished, and provided the anesthetic gases, as well as the anesthetic machine and its appliances, or that he caused the same to be procured and provided for; that the explosion and fire were caused solely and entirely by the gross fault, negligence, and carelessness of the defendant, Dr. Ochsner, in the selection of the kind of anesthetics which he administered to plaintiff, which together with the instrumentalities used were under the control of said defendant, his assistants, employees, and nurses; that Dr. Ochsner was also at fault in failing to take the necessary precautions and preventatives against the occurrence of an explosion while using the type of anesthetic gas that was administered to plaintiff; that the exact cause of the explosion and fire is unknown to plaintiff but the cause is within the knowledge of the said defendant.
Dr. Ochsner made answer to the petition denying that he was negligent or at fault or that he was in any way responsible for the accident. The answer further alleges that the explosion and fire occurred without fault on the part of anyone as all reasonable and necessary precautions had been taken to prevent such occurrence.
Subsequently the plaintiff filed a supplemental and amended petition in which he reiterated all of the allegations of the original petition; he further alleged that the Aetna Casualty & Surety Company is the public liability insurer of Dr. Alton Ochsner, the Foundation Hospital, and Ochsner Medical Foundation; that if the anesthesiologist and nurses were not the employees of Dr. Ochsner, they were the employees and agents of Foundation Hospital or of Ochsner Medical Foundation, and they acted in the course and scope of their employment; that if the anesthetic appliances and instrumentalities had not been procured, furnished, and provided by Dr. Alton Ochsner, they were provided by Foundation Hospital or by Ochsner Medical Foundation for use by their agents and employees. It is alleged by plaintiff that he had set forth all knowledge he has concerning the accident and he pleads the doctrine of res ipsa loquitur. The prayer of the petition is that Dr. Alton Ochsner and Aetna Casualty & Surety Company be cited to appear and answer plaintiff's demand, and that after all due proceedings there be judgment in favor of petitioner and against Dr. Alton Ochsner and Aetna Casualty & Surety Company, in solido, for the full sum of $50,000, with legal interest thereon from the date of judicial demand until paid and for all costs.
Aetna Casualty & Surety Company interposed a plea of prescription of one year to the demand made against it in the supplemental and amended petition. This exception was overruled by the lower court and referred to the merits of the case. Whereupon the surety company made answer, the pith of which is that it reiterates and adopts the answer made by Dr. Ochsner to the original petition; it denied that Dr. Ochsner, the Foundation Hospital, or Alton Ochsner Medical Foundation were in any way negligent or at fault and that they are not legally responsible for the explosion which occurred during the course of the operation; it pleads further that the doctrine of res ipsa loquitur has no application.
After the case was tried on the issues presented by the pleadings, there was judgment rendered in favor of the plaintiff, Oscar J. Andrepont, and against the defendants, Dr. Alton Ochsner and Aetna Casualty & Surety Company, for the sum of $30,000. The said defendants have taken this appeal.
Aetna Casualty & Surety Company also complains of the judgment that was rendered May 28, 1952, overruling and referring to the merits its plea of prescription of one year prescribed by LSA-C.C. art. 3536 for offenses and quasi offenses. The exceptor reurges the exception, which is aimed at plaintiff's attempt to implead the exceptor as defendant as the insurer of Foundation Hospital and Alton Ochsner Medical Foundation.
The accident in the operating room happened on March 21, 1949, and plaintiff filed his suit for damages against Dr. Ochsner *66 on November 25 of the same year. It was not until May 18, 1951, some twenty-six months after the accident and about eighteen months after the suit had been brought, that plaintiff filed the supplemental petition bringing into the case as a party defendant the Aetna Casualty & Surety Company as insurer not only for Dr. Alton Ochsner but also as insurer for the Foundation Hospital and Alton Ochsner Medical Foundation. In his original petition plaintiff alleged:
"That on March 21st, 1949, plaintiff was taken to the operating room at `Foundation Hospital' where the said defendant, Dr. Alton Ochsner, undertook to perform the operation, and, without the knowledge of plaintiff and in pursuing his purpose of operating upon plaintiff, Oscar J. Andrepont, and removing his left lung, decided to and elected to and did administer to plaintiff, either personally or through his assistants, employees and nurses, and caused to be administered to said plaintiff a general anesthetic in the nature of certain gases or combination of gases, the name of which is unknown to plaintiff but is well known to and within the knowledge of defendant, for the purpose of placing plaintiff in a state of unconsciousness from the influence of said gases and in order to remove plaintiff's left lung while plaintiff was in said unconscious condition."
The supplemental and amended petition alleges:
"That policy provides and stipulates that Aetna Casualty and Surety Company (would) indemnify its aforesaid insured, Alton Ochsner and Foundation Hospital and Ochsner Medical Foundation, or any of them, against liability imposed by law in damages for the injuries petitioner sustained at the time and place and in the manner described and declared on in his original petition in the entitled cause.
* * * * * *
"`If the aforesaid anesthetist and nurses were not Alton Ochsner's employees, they were employees or agents of Foundation Hospital or of Ochsner Medical Foundation, and they were then and there acting in the course and scope of their employment.'
* * * * * *
"`If the said anesthetic, appliances and instrumentalities were not procured, furnished and provided by Alton Ochsner, they were provided by Foundation Hospital or by Ochsner Medical Foundation for use by their aforesaid agents and employees in petitioner's surgical operation.'"
The evidence shows that Dr. Alton Ochsner is the President of the nonprofit corporation known as Alton Ochsner Medical Foundation, which is the owner and operator of the Foundation Hospital, in which the accident occurred. This being so, the only question presented by the plea of prescription is whether the bringing of the suit against Dr. Alton Ochsner individually within a year of the date of plaintiff's injuries had the effect of interrupting the prescription of one year as against the corporation Alton Ochsner Medical Foundation and its public liability insurer, Aetna Casualty & Surety Company. If the filing of the original suit interrupted prescription as to the surety company, the plea is unavailing to said defendant.
We think that the filing of the suit against Dr. Ochsner did have the effect of interrupting prescription, and we fail to see any merit in the plea. The settled jurisprudence warrants our view.
In 1927 this court decided the case of Norwich Union Ind. Co. v. Judlin & Whitmire, 7 La.App. 379, which was a suit for damages for personal injuries resulting from the operation of a motor truck owned and operated by a corporation named Peter Judlin, Inc. The suit was brought originally against Peter Judlin as owner of the truck, but on the trial of the case it developed that the truck was not owned by Peter Judlin but was owned and operated by the corporation known as Peter Judlin, Inc., of which Peter Judlin was the *67 President. Thereafter the plaintiff filed a supplemental petition praying for judgment against the corporation, Peter Judlin, Inc. In the meantime a year had elapsed from the time of the accident; Peter Judlin, Inc., pleaded prescription. We overruled the plea saying that the suit and citation against Peter Judlin individually "though insufficient to base a judgment against Peter Judlin, Inc., was sufficient to interrupt prescription against the latter." The Supreme Court refused to grant a writ of review.
The principle involved in the above-cited case can not be distinguished from the principle involved in the instant case.
In support of our decision in Norwich Union Ind. Co. v. Judlin & Whitmire, we cited the case of Gueble v. Town of Lafayette (inadvertently giving the title as Campbell v. Hart), 118 La. 494, 43 So. 63, wherein it was held that a citation addressed to the Mayor of the Town of Lafayette, although it was not sufficient to sustain a judgment against the town, was sufficient to interrupt prescription of the claim against the town. In that case the principle underlying the rule is that a citation addressed to the wrong party may give sufficient information to the right party to cause an interruption of the period of prescription of the claim against him, even though the citation could not be the basis for a valid judgment against either party. We said:
"* * * While we hold that matters for that purpose were stayed, we hold that the knowledge brought home to the mayor, who was the proper person to whom that knowledge should have been conveyed, had the effect of interrupting the running of prescription."
In Jackson v. American Employers' Insurance Co., 202 La. 23, 11 So.2d 225, in which both the Norwich Union Indemnity Co. v. Judlin & Whitmire and Gueble v. Town of Lafayette cases were cited, the facts were that three insurance companies were doing business as a group under the title "The Employers' Group of Boston, Mass.," letterheads of which bore the names of all three companies, having the same office for their claim department, the same telephone, same manager and same employees in that department. The Supreme Court held that the filing of suit against one of the companies under a mistaken belief that it was the insurer under a policy covering an automobile which caused the injury was sufficient to interrupt the one-year period of prescription against the company which had issued the policy.
Our courts have adopted a liberal attitude free from the fatalities of technicalities in cases involving analogous situations. Where a defendant is sued in a representative capacity, such as receiver of an insolvent corporation, or administrator of a succession, and is later sued in his individual capacity on the same cause of action, the first suit has been held to interrupt prescription running on the demand. Succession of Saunders, 37 La.Ann. 769; Vernon v. Illinois Cent. R. Co., 154 La. 370, 97 So. 493; Anding v. Texas & P. Ry. Co., 158 La. 412, 104 So. 190; Warn v. Mexican Petroleum Corporation, 6 La.App. 55; Calamia v. Mayer, La.App., 174 So. 668. It makes no difference that the plaintiff has no right to bring the action. Flower v. O'Connor, 17 La. 213; Bell v. Mix, 1 Rob. 393; Blanc v. Dupre, 36 La.App. 847; Becnel v. Waguespack, 40 La.Ann. 109; Boyd v. Heine, 41 La.Ann. 393, 6 So. 714; Wolf & Sons v. New Orleans Tailor-made Pants Co., 110 La. 427, 34 So. 590; Ray v. Liberty Industrial Life Ins. Co., La.App., 180 So. 855.
In Bowerman v. Pacific Mut. Ins. Co., 212 La. 999, 34 So.2d 53, 55, a workmen's compensation case, the Supreme Court held that prescription was not interrupted as to the insurer of the employer by the filing of the suit against an improper defendant, but we notice that the Court was careful to say:
"* * * since the prescriptive period had expired without the filing of a suit against the true insurer, and since there was no proof that the insurer had notice or actual knowledge *68 that plaintiff was asserting his claim by instituting suit within the prescriptive period, the plea of prescription is valid." (Italics ours).
In the recent case of Davis v. Lewis & Lewis, 226 La. 1059, 78 So.2d 173, the Supreme Court held that where the insurer's identity was unknown to plaintiff, service of citation on the accident adjustor for the insurer within one year of the accident on a petition seeking to make the insurer a defendant through the adjustor gave the insurer sufficient notice and knowledge that plaintiff was asserting his claim as against the insurer so as to interrupt the one-year period of prescription.
Thus it appears that all of the cases seem to be based on the theory that the knowledge of the demand, its origin, and basis, are imparted to the defendant even though the original suit was brought against the wrong defendant or against the defendant in an improper capacity, and even when brought by an improper plaintiff. So long as the proper person has been apprised of the demand in any legal capacity, prescription is interrupted.
Notwithstanding the fact that the suit was directed against Dr. Alton Ochsner in an individual capacity, nevertheless he, in the capacity of President of Alton Ochsner Medical Foundation, which owns and conducts the Foundation Hospital, was fully apprised of the plaintiff's demand for $50,000 as well as the nature of that demand. The suit forcibly gave notice to Dr. Ochsner, as President of the corporation, that plaintiff sought redress for the injuries which he had sustained in the operating room in Foundation Hospital on March 21, 1949. There is nothing better settled in our jurisprudence than that the knowledge of a president of a corporation relating to its affairs and business is knowledge to the corporation. Serio v. American Brewing Co., 141 La. 290, 74 So. 998, L.R.A.1917E, 516; State v. B. F. Williams Cypress Co., Id., 131 La. 62, 58 So. 1033; 132 La. 949, 61 So. 988, Ann.Cas. 1914D, 1290; Provident Life & Trust Co. v. Fidelity Ins. Trust & Safe Deposit Co., 203 Pa. 82, 52 A. 34, 36; Antrim Lumber Co. v. Bolinger & Co., 121 La. 306, 46 So. 337; National Park Bank v. Concordia Land & Timber Co., 159 La. 86, 105 So. 234.
Due to the peculiar circumstances which exist in the instant case, which bear a closeness in resemblance to those existing in many of the cited cases, we think that suit having been brought within the year against Dr. Ochsner had the legal effect of interrupting the one-year prescription as against Alton Ochsner Medical Foundation and its insurer, Aetna Casualty & Surety Co., followed by a suspension of prescription against both during the pendency of the suit. Continental Supply Co. v. Fisher, 156 La. 101, 100 So. 64. Plaintiff, then, had the right to bring into the suit by way of the supplemental and amended petition either or both even though more than one year had elapsed between the date of the accident and the date on which the supplemental and amended petition was filed. Act No. 195 of 1948, as amended, now LSA-R.S. 22:655; see also Sewell v. Newton, La.App., 152 So. 389.
The operation had been in progress for from ten to twenty minutes and Dr. Ochsner had opened the patient's chest by having gone through the skin and the superficial muscles when the explosion occurred. Dr. Davis at the time was connecting a water monometer (which is an instrument used to measure the amount of pressure on the inside of the patient's chest) with the anesthetizing system. He states there was a flash of fire and an explosion, but he does not know which came first, the fire or the explosion. However, he stated positively that it was the mixture which was being used to anesthetize the patient that exploded. The fire took place in the vicinity of the anesthetic machine but neither Dr. Ochsner nor Dr. Davis could state what was its cause. None of the other persons who were present in the operating room, two or three assistants to Dr. Ochsner whose names do not appear in the testimony, were called upon to testify. Drs. Ochsner and Davis asserted there was no electrical equipment or units in the room *69 from which a spark could have come, and Dr. Ochsner "feels sure" the cause of the occurrence was static electricity. He states that he knows of just such an accident which happened at another hospital about ten or twelve years before. Dr. Davis, by indulging in a process of elimination, "guessed" that there had been a static electric spark. Dr. Ochsner told of the concern shared generally about static electricity in operating rooms and mentioned that scientists are constantly making a study of the subject and that as a result of these studies changes are made in operating room methods almost yearly. Dr. Davis referred to static electricity as one of those things about which "one does not know enough to teach a whole lot."
Dr. John Adriani, an eminent specialist in the field of anesthesiology, was called as an expert by defendants. The witness is well qualified as an expert in that branch of medicine; he is the author of four books on the subject, has written many articles, and has perfected a filter that is widely used on anesthetic machines. Dr. Adriani testified that the most common cause of explosions, which are themselves uncommon, in anesthetic machines is static electricity. He defines static electricity as electricity that "is not in motion." Static electricity and lightning are one and the same except, of course, that lightning is on a larger scale. Dr. Adriani stated that static electricity is being generated at all times, such as when one walks, moves his hand, combs his hair, etc. In operating rooms it is necessary that objects be continually in motion during surgical procedures and when objects are moved and come into contact with others, electrons will be generated when the objects are pulled apart, and thus the possibility of static electricity is continuously present. He stated that all couplings on the anesthetizing equipment are composed of brass, and he believed that the static discharge most likely occurred when the brass couplings were brought into contact. The tubing connecting the monometer with the anesthetic machine, not being conductive, is a circumstance creating a dangerous area in which static electricity might be generated when the two parts are separated. The removal of the tube could cause an accumulation of static electricity.
Dr. Adriani believes that the prevention of static electricity is not possible, but he stated that its accumulation might be minimized by making everything in the operating room as conductive as possible and by eliminating such objects that are nonconductive. He said a conductive substance is one that allows easy passage of electrons. As an example, rubber will not permit the passage of electrons but a brass chain will. It is not possible to do away with all nonconductive articles such as rubber gloves as these must be used by the surgeon. He also spoke of the clothing worn by those in the operating room. It is recognized that cotton material will conduct better and generate less static electricity than silk or nylon. Some parts of the anesthetic machine are of rubber and therefore are nonconductive, but at the present time there is being incorporated into the composition of rubber a substance which makes it conductive, but nothing has ever been developed by science that is "foolproof" against static electricity.
According to Dr. Adriani the operating room in which the accident took place had a conductive floor. In 1949 conductive floors in operating rooms were not generally recommended, but a procedure called "intercoupling" was stressed then. Intercoupling is the equivalent of grounding and connects the patient, surgeon, operating table, anesthesiologist and the anesthetic machine on a grounded level so that no spark can occur between any of the five objects. However, Dr. Adriani stated that no one could say how long a particular floor will remain conductive. Such substance as a coating of wax might render it nonconductive and he knows of floors that have become nonconductive and consequently are ineffectual. All objects in the room to be at the same static potential would have to be in contact with the conductive floor and all persons in the room would have to be wearing conductive shoes or have some similar contact between the feet and the floor. The witness made the *70 further observation that if the floor was conductive and was clean and free of film it would remain conductive, and if all objects and all persons in that room were in electrical contact with the conductive floor, it is most unlikely that a static spark could be generated.
The anesthetic machine came in for some discussion. It had been acquired along with other equipment by the Foundation Hospital some six years before from the U. S. Army which formerly operated the hospital, and Drs. Ochsner and Davis were in accord that the machine was standard as far as machines in use in this locality go. Dr. Adriani agreed that the anesthetic machine rated as standard both in 1949 and at the time of the trial.
Drs. Ochsner and Davis each wore the conventional and recommended operating room garb, which is a cotton cloth "scrub suit" which consists of a shirt, pants, cap, mask, and socks. Their shoes were old leather ones. The use of old shoes is necessary because perspiration from the human body contains salt and the salt residue resulting from perspiration makes the shoes conductive, salt being a good conductor.
It is well agreed that the anesthetic gas is explosive. Dr. Davis explained that there are other gases which are not explosive, but patients will suffer ill effects from their use. Dr. Davis had full charge of selecting the type of anesthetic and he likewise had full charge of the anesthetic machine throughout the operation. He had been chosen to be the anesthesiologist by the anesthesiological staff of the Foundation Hospital. Dr. Ochsner had nothing to do with his selection.
We now reach the most important question, and that is, what were the steps taken by the Foundation Hospital and its employee, Dr. Davis, to see to it that the danger from static electricity was minimized. Dr. Davis stated there are certain precautions which are commonly employed to lessen the likelihood of the development of static electricity. When asked what precautions he himself had taken, he made this answer:
"By virtue of the clothing which I was wearing; by virtue of the connection between the operating table, myself and the patient with the floor of the Operating Room, it should be possible for any static which might develop to be grounded. At no time during the minutes preceding the explosion was I out of contact with any part of the apparatus which should not have been grounded. It has always been part of my training and the training of everyone to keep oneself constantly grounded, and in contact with something that is grounded."
Dr. Davis testified that the anesthetic machine was grounded because it rests on metal wheels having rubber tires, but he did not remember if there was any drag chain on the carriage and as far as he knows there was no drag chain on the operating table. The statement that rubber tires serve as a ground cannot be reconciled with Dr. Adriani's assertion that rubber is a nonconductive substance.
Dr. Ochsner, when asked the question as to what he did to prevent the occurrence of a static electric spark, stated that he had done nothing, but subsequently he explained this answer by saying that the operating surgeon is under no duty to do anything in particular except to avoid the wearing of improper clothing.
Earl A. Oster, Jr., is the maintenance man of Foundation Hospital and has been employed there since 1946. He has a grammar school education and has had special training in taking care of electrical medical equipment in the U. S. Army Medical Supply in St. Louis, Missouri. He has also studied electricity, radio and electronics. Oster states that the floor in the operating room was conductive as shown by an examination he made with an instrument he called an ohmmeter. He claims that all equipment, including the operating tables, was conductive. The method used to prevent static electricity in operating rooms is to ground everything *71 by putting ground straps on them, and "we grounded everything." These ground straps mentioned by Oster were referred to by Dr. Davis as drag chains. Oster said that "a lot of times" Dr. Grant would tell him whenever a ground strap had been broken off or had been taken out of use and that he would "come up and put on a strap right away so that it would be properly grounded." Oster saw the anesthetic machine after the explosion had occurred but he could not recall whether it had a ground strap.
Carroll S. Crawford, a qualified consulting engineer, appeared as an expert witness on behalf of plaintiff. He reiterated the other testimony to the effect that if there is a conductive flooring and all objects and persons in the room are in contact with the floor, there could be no static charge because everything would be at the same level or potential. He further made the significant statement that if everything possible was done from an electrical standpoint and static electricity occurs, such occurrence must necessarily result from human failure.
The learned trial judge in his reasons for judgment stated that it was his opinion that the doctrine of res ipsa loquitur was applicable, and that taking into consideration the testimony of the various witnesses, a case of negligence on the part of Dr. Ochsner had been established.
Counsel in the case are very much in a controversy on the question of whether in a case such as we have under consideration the doctrine of res ipsa loquitur can be applied. The plaintiff's position is that as a result of that doctrine he is under no obligation whatever to show any negligence on the part of anyone, and that if the defendants would escape liability they must shoulder the burden of showing that there was no fault on their part from which the accident in the operating room resulted.
Per contra, the defendants vehemently maintain that the doctrine has no application to the case and that there can be no recovery since the plaintiff has not successfully carried the burden placed on him by law of proving negligence. They also adopt the alternative position that if the doctrine of res ipsa loquitur does apply to the case, then defendants have exculpated themselves from liability by having shown that there was no negligence, because such accidents in operating rooms cannot be avoided. Their first argument is that the doctrine does not apply in a malpractice suit against a physician or surgeon for the reason that persons engaged in the medical profession should not be required at their peril to explain why their treatment of a patient or an operation on a patient was not successful and failed to produce the desired results.
There was a similar controversy in Meyer v. St. Paul-Mercury Indemnity Co. of St. Paul, Minn., La.App., 61 So.2d 901, 905, decided by us, which was a malpractice action brought by a patient whose tooth became dislodged and found its way into one of her lungs during the process of the administration of an anesthetic prior to the extraction of her teeth. This court held that the doctrine of res ipsa loquitur was applicable, but found that the evidence established that both the anesthetist and the oral surgeon had done all that reasonably careful practitioners in their respective professions could have been expected to do and, hence, they were not liable. During the course of our opinion we said:
"We have no doubt at all that the doctrine of res ipsa loquitur has no application where, in the ordinary suit against a physician, a surgeon, or a dentist for malpractice, all that is shown is that the desired result was not accomplished. On the other hand, however, we think that where the complaint is not based on the failure to obtain satisfactory results, but is based on the charge that, during the rendering of the professional services, there occurred some untoward event, or some omission or act from which there resulted something not ordinarily found to result during such treatment or operation, the physician, or the surgeon, or the dentist may be required to *72 show that such unusual occurrence did not result from negligence on his part.
* * * * * *
"We conclude that the mere fact that the anesthetist, who was administering the anesthetic, and the dentist, who was to remove the teeth, were professional people both engaged in the performance of professional duties, does not in itself prevent the application of the doctrine res ipsa loquitur, and that the doctrine in certain situations such as have been suggested, may have application.
* * * * * *
"Where the doctrine res ipsa loquitur is applied, the defendant need not show just what was the cause of the occurrence, but must show that there was no fault from which the accident resulted. We think the situation is the same as that which is present where a passenger is injured on a common carrier, and in which situation, the Supreme Court had the following to say in Cusimano v. New Orleans Public Service, 170 La. 95, 127 So. 376, 378:
"`Our conclusion is that the doctrine of the Hopkins, Spurlock, and LeBlanc cases [Hopkins v. New Orleans R. & L. Co., 150 La. 61, 90 So. 512, 19 A.L.R. 1362; Spurlock v. Shreveport Traction Co., 118 La. 1, 42 So. 575; LeBlanc v. Sweet, 107 La. 335, 31 So. 766] is correct in so far as these cases hold that, where a passenger is injured, the burden of proof is on the carrier to show that it was free from any negligence which might have caused the accident, but that the doctrine of those cases is too broad (if such be their doctrine) in holding that the carrier can discharge such burden of proof only by showing how and why the passenger was injured, even though it does show that the injury occurred through no negligence of its own.'"
Meyer v. St. Paul-Mercury Indemnity Co. of St. Paul, Minn., supra, was reviewed by the Supreme Court and on rehearing, 225 La. 618, 634, 73 So.2d 781, 786, the Court said:
"The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. As stated by the Court of Appeal in its opinion in this case, however, that does not mean that the defendant must show just what was the cause of the occurrence.
"In this case the rule may well apply to the anesthetist, Dr. Evelyn Katz as she was the one handling the dangerous instrumentality which came in contact with the plaintiff's upper teeth and allegedly caused one to become dislodged. * * *"
Dr. Ochsner is charged with negligence in the selection of the type of anesthetic which was to be administered to plaintiff, and it is alleged that the instrumentality by which the anesthetic was administered was under his control, or under the control of his assistants, employees, and nurses. He is also alleged to have been at fault for having failed to take any precautions and preventatives against the occurrence of the explosion.
There was no negligence or lack of skill or competence on the part of Dr. Alton Ochsner. We do not think that the law placed the burden on him of exculpating himself from negligence or explaining that there was no negligence on the *73 part of the Foundation Hospital or on the part of the persons who were in the operating room at the time of the accident. The record shows that Dr. Ochsner possessed the required skill and competence and that in applying that skill in the operation he used reasonable care and diligence. Dr. Ochsner was graduated from Washington University in St. Louis, Missouri, in the year 1920, and since then has made his specialty the field of surgery. He performs as many as twenty to twenty-five operations each week. There is no substance in those averments that he selected the wrong type of anesthetic or that the instrumentalities used to administer it were under his control or that he had control or supervision of the anesthesiologist or the equipment. Nor can it be said that he was guilty of selecting an incompetent anesthesiologist, for the record shows that he had nothing to do with the choice of Dr. Davis, but rather Dr. Davis was selected by the anesthesiological staff of Foundation Hospital. It is true Dr. Ochsner at one point in his testimony made the statement that he had done nothing to prevent the explosion, but we are satisfied with his subsequent explanation that the operating surgeon is not required to do anything except to make certain that he is garbed in the proper and conventional operating room clothing. The testimony is clear to the effect that Dr. Davis was exclusively in the employ of Foundation Hospital, which paid his salary, and that the hospital is owned by the corporation called Alton Ochsner Medical Foundation.
In speaking of the rule, that the law only exacts of physicians and surgeons that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence along with their best judgment, as being applicable to an operating surgeon, the Supreme Court on the rehearing in Meyer v. St. Paul-Mercury Indemnity Company, supra, also said:
"* * * But Dr. Leopold Levy, the operating oral surgeon, had nothing to do with the instrument; it never was under his control, and we fail to see why he should be called on to exculpate himself from negligence in the use of it. As to him it would seem that liability would have to be determined on some other ground and that in order to free himself he would have to show the skill required under the rule and that in preparing for the extraction of plaintiff's teeth he exercised reasonable care and diligence and used his best judgment."
The instant case differs from the cited case in which the Supreme Court held that "the rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur" as to Drs. Levy and Katz who were the defendants.
We believe that the doctrine of res ipsa loquitur applies without limitations in the instant case as to Foundation Hospital, whose insurer, the Aetna Casualty & Surety Company, was made defendant in the supplemental and amended petition and is sought to be held liable. With respect to Foundation Hospital we do not believe that the explosion of the anesthetic machine is to be considered from any different point of view than other explosions which have been the subject of litigation in which the doctrine of res ipsa loquitur has been held to apply. This certainly is one of those cases where the plaintiff cannot be expected to have any information as to the cause or causes of the explosion whereas the Foundation Hospital, on the contrary, is assumed by the law to be fully informed on that subject matter, and as it was an accident of that type which ordinarily does not occur when due care has been exercised, the rule of evidence that the accident speaks for itself, res ipsa loquitur, raises a presumption of negligence from the fact of the accident itself, and if a defendant is to free himself from liability he must show that there was no negligence at all on his part. Lykiardopoulo v. New Orleans *74 & C. R., Light & Power Co., 127 La. 309, 53 So. 575.
After reading and rereading and carefully sifting all of the evidence adduced in the case before us, there is only one logical and reasonable conclusion that can be arrived at and that is that the proximate cause of the explosion which resulted in plaintiff's injuries was occasioned by some fault on the part of the agents or employees of Foundation Hospital in not taking those precautions which were necessary against the danger attending the occurrence of a static electric charge. The surety company has not proven that the agents and servants of Foundation Hospital were not guilty of negligence and consequently it has not exculpated itself from liability.
We are satisfied that there was nothing wrong either with the gas or the anesthetic machine; the machine was considered standard in 1949 and was still rated standard at the time of the trial. We are satisfied, too, that the Foundation Hospital employed a competent physician as anesthesiologist in the person of Dr. David A. Davis, as the evidence reflects his experience and competence in his particular medical specialty.
But we are not satisfied that Foundation Hospital has shown that it had done everything that is recognized as necessary to minimize the danger from the generation of static electricity. The defense witnesses testified in a sort of general way that the hospital had taken certain precautions, but the evidence as a whole leads us to the belief that all of the precautions required by the rules of safety as applied to operating rooms had not been taken.
As before stated, the testimony of all of the expert witnesses makes it very plain that in order to promote safety in an operating room and to guard against the occurrence and effect of static electricity, it is required that as many conductive objects as possible be used and that such nonconductive articles as can be done without should be eliminated. There is unanimity in the opinions of the witnesses that the grounding of objects wherever possible is necessary to promote the highest degree of safety, but notwithstanding this, the Foundation Hospital has failed to show that the operating table itself and the carriage on which the anesthetic machine rested were properly grounded. Oster went to the operating room after the accident, but he did not notice whether there was a ground strap, or as Dr. Davis called it, a drag chain, on the anesthetic machine's carriage. Oster made no mention of a strap on the operating table, Dr. Davis does not know whether the anesthetic machine was grounded and as far as he could see there was no drag chain on the operating table.
Reverting back to the testimony of Dr. Adriani, there is a likely possibility that a static electric spark, which everyone agreed must have been the cause of the accident, was generated by the couplings of the anesthetic machine and the spark could not be drained off to the floor on account of the want of a ground strap on the carriage of the machine, which is equipped with metal wheels with rubber tires which we understand are nonconductive. At least the Foundation Hospital has not made it certain that the lack of the ground strap was not the cause of the accident. Our appreciation of the evidence is that no accident could have happened if there had been a proper grounding.
Our conclusion is that the defense has fallen short of carrying the burden imposed on it by the doctrine of res ipsa loquitur, that is, proving its freedom from negligence in the matter of the accident and plaintiff's consequent injuries. Under the law we must presume that the accident happened as a result of negligence, and as there is liability in Foundation Hospital to plaintiff, the defendant insurer must respond in damages.
After the accident plaintiff was taken to his room and did not regain consciousness until the following morning. In addition to suffering severe pains in the head, he had excruciating pains in the nose and his throat was "afire and burning" and he could not talk. There were several doctors and hospital attendants present and apparently *75 plaintiff was given sedation, for when he awoke the next time, Dr. Ochsner was present and plaintiff wrote on paper the words "ice" and "fire" and he was asked where the fire was and plaintiff pointed to his throat. Although the record does not show it, it is reasonable to suppose that as a result of the gas becoming aflame, plaintiff inhaled some of the fire. Plaintiff also had burns of the tongue and mucous membrane of the mouth, throat and nose; there was a probable fracture at the anterior end of the base of the skull, which his physician testified was consistent with the presence of cerebrospinal rhinorrhea; and ecchymosis of both eyes, and intracranial aerocele in subdural and subarachnoid spaces. We have mentioned that a tracheotomy was performed immediately after the explosion, and as a result there remains a scar on the throat approximately 2½ inches long which cannot be concealed unless plaintiff wears a collar. The treatment of the cerebrospinal rhinorrhea required eight spinal punctures or taps; the spinal punctures produced headaches and the cerebrospinal rhinorrhea caused a temporary loss of smell. Subsequently, plaintiff suffered from ulcers of the stomach and was treated for that condition after the accident occurred, and the testimony of plaintiff's physician is that the ulcerous condition could have been brought about from the effects of the accident. At the time of the trial plaintiff had made considerable recovery and was continuing to show betterment of condition, but nevertheless he says he was unable to work in his grocery store, was still under the care of a physician, and had some difficulty in his speech.
It was not until two weeks after the accident before the pneumonectomy was performed on plaintiff.
Plaintiff at the time of the accident was about 55 years of age, and it is true that he was afflicted with a serious disease, which was diagnosed as cancer of the left lung, but plaintiff's said condition does not mitigate against his right to recover damages. A tort-feasor owes as much duty to avoid injuring the sick as the well.
No one could doubt that plaintiff must have suffered excruciating pains, both physical and mental, and it is not difficult to understand plaintiff's mental state when he was taken into the operating room the second time after having gone through a harrowing experience the first time he had been taken into that room.
The evidence also shows that plaintiff had some additional expenses at the hospital and was called upon to make some incidental expenditures, all as a result of the accident. He also testified that he had to employ a clerk to operate his grocery store and that in addition to having the salary of the clerk to pay, he also suffered a loss in net business earnings.
We think that considering all of the circumstances shown in the case that the judgment of $30,000 given plaintiff by the trial judge is excessive and our thought is that it should be reduced to a proper figure, say $15,000. There is no rule or standard by which plaintiff's injuries can be measured, but we think said amount will do substantial justice.
Therefore, for the reasons assigned, insofar as the judgment casts Dr. Alton J. Ochsner be and the same is hereby avoided and reversed and the judgment is amended so as to run in favor of Dr. Alton Ochsner dismissing plaintiff's suit at his cost; the judgment is further amended so as to cast Aetna Casualty & Surety Company for the sum of $15,000; as thus amended and in all other respects, the judgment is affirmed.
All other costs are to be borne by Aetna Casualty & Surety Company.
Reversed in part; amended and affirmed in part.
REGAN, J., concurs.