207 So.2d 868 (1968)
Adolph M. DE BLANC
v.
SOUTHERN BAPTIST HOSPITAL, the Hanover Insurance Company, and Certain Underwriters at Lloyd's London.
No. 2941.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1968.
*869 Richards, Scott & Hoepffner, Charles E. Richards, New Orleans, for plaintiff-appellant.
Adams & Reese, Sam A. Le Blanc III, New Orleans, for Southern Baptist Hospital and The Hanover Insurance Co., defendants-appellees.
Schoemann, Gomes & Ducote, Monte J. Ducote, New Orleans, for Certain Underwriters at Lloyd's London, defendants-appellees.
Before BARNETTE, JOHNSON and TUCKER, JJ.
BARNETTE, Judge.
This is an appeal by plaintiff, Adolph M. De Blanc, from a judgment rejecting his demands and dismissing his suit for damages on account of injuries sustained by his wife, which injuries he alleged contributed to and hastened her death.
The suit is based upon either the alleged negligence of employees of the Southern Baptist Hospital or the alleged breach of their professional responsibility in failing to protect their patient Mrs. De Blanc from falling out of bed by the proper use of protective side rails on the hospital bed. Defendants in the suit and appellees herein are Southern Baptist Hospital; The Hanover Insurance Company, its general liability insurer; and Leslie Percy Fowle, an underwriter at Lloyd's London, the malpractice insurer of the hospital.
The plaintiff's wife, Mrs. May Bischoff De Blanc, who was then 73 years of age, was admitted to the Southern Baptist Hospital on August 28, 1963, under the orders of her physician, Dr. Maurice E. St. Martin. It is alleged that Mrs. De Blanc, at about 4 a. m., September 4, 1964, either fell from her hospital bed or, in an attempt to get out of bed, fell and sustained a hip fracture. She was discharged from the hospital October 7. On November 3, she was readmitted and remained a patient there until her death on January 7, 1965.
Mrs. De Blanc had been chronically ill for a number of years and under the treatment of Dr. St. Martin. She was admitted to the hospital in the emergency room under orders of Dr. St. Martin for certain tests, examinations, and treatment of her chronic anemia, nausea, arteriosclerosis, nutritional deficiency and generally run-down condition. The next day after admission she was transferred from the emergency room to a semiprivate room.
Mrs. De Blanc was ambulatory and came to the hospital in a taxicab. Rehabilitative treatments were given and she appeared to regain some strength. At no time prior to the accident on September 4 was she irrational or any less alert or ambulatory than when she was admitted. On the contrary, if anything, she was improved. She asked Dr. St. Martin for bathroom privileges because of her objection to use of the bedpan. This was granted with the express instruction, which Dr. St. Martin said she fully understood, that she obtain assistance in getting in and out of bed and to and from the bathroom. Dr. St. Martin testified that he wrote the order for bathroom privileges on August 31, and told her: "Now, look, Mrs. De Blanc, if I let you go to the bathroom *870 I insist that you don't go unless you call somebody to help you to go there. I don't want you to hurt yourself." He also testified that there was no question in his mind that she understood the instructions.
Just how Mrs. De Blanc fell, and what caused her to fall, on the morning of September 4, is not entirely certain. There was considerable testimony about a footstool to be used in getting in and out of bed and whether or not her husband, the plaintiff, had pushed the stool under the bed before leaving the hospital room about 9 o'clock that night. We are convinced that Mrs. De Blanc fell in some manner when attempting to go to the bathroom without assistance in violation of the express instructions of her physician.
Plaintiff has attempted to show negligence on the part of the hospital employees in leaving the side rails of the bed down in violation of their duty of protection of the patient. It is argued that had the side rails been in a raised position the patient would not have fallen out of the bed or could not have attempted to get out of the bed unassisted. When Mrs. De Blanc was found on the floor after her fall, the rails on that side of the bed were down.
Dr. St. Martin did not order the use of bed rails, but observed that each time he had visited the patient prior to the accident the bed rails were in use. He testified that he thought bed rails should have been used but saw no reason to order their use since they apparently were being used anyway.
On the night of September 3 between 8 and 9 o'clock Mrs. De Blanc was given medication for nausea and also in preparation for a gall bladder examination planned for the next morning. At about 9 o'clock she was given an injection of sodium luminal (one grain) and atropine (one two-hundreths of a grain). The doctor described the luminal as "hypnotic," a fast-acting sedative. The dosage was described as small. The atropine was described as an anti-nausea drug and would not prolong or increase the hypnotic effect of the luminal. Paregoric was also given which has some qualities of sedation, but the combined sedative effects of the oral medication and injections were estimated to last from three to four hours. Furthermore, it was testified by Dr. St. Martin that Mrs. De Blanc had for a long time been on sedative type drugs and had built up a tolerance to the drugs. We are, therefore, convinced that by 3 a. m. on September 4 she was not under sedation.
When the floor nurse came in to give the injection at about 9 o'clock, Mr. De Blanc was excused from the room and went home for the night. If the bed rail had been up, it was lowered to facilitate the injection, but, at any rate, we must conclude from the evidence that it was not in a raised position when the nurse left the room and Mrs. De Blanc was left alone. The floor nurse Susan P. Lindsey, who came on duty at 11 p. m., testified that the bed rail was down when she was summoned to the room immediately following the accident. She did not know by whom or when the rail was lowered.
Miss Lindsey was questioned at length about the use of bed rails. She testified that if rails are ordered by the attending physician it is the duty of the hospital employees to carry out that order. There is no general policy in force by the hospital for the use of bed rails and the decision is made by the nurses and hospital employees, in the absence of specific orders by the doctor. The criteria for determining the use of bed rails are disorientation of the patient, sedation, post-operative condition, age, or any other condition which might reasonably indicate a danger of the patient's falling out of bed.
Miss Lindsey was questioned as to whether or not she would have raised the bed rail if she had come into the hospital room and found it down. She said she would not have raised it if the patient were asleep for fear that the disturbance might awaken her.
*871 From the testimony of all the witnesses we are convinced that there was nothing about the condition of Mrs. De Blanc on the night in question to require the use of bed rails, and it was neither negligence on the part of the hospital employees in lowering the rails or permitting them to remain down, nor a breach of professional duty by the failure to exercise discretion in favor of the use of the rails.
Immediately after Mrs. De Blanc fell, Miss Lindsey was summoned to the hospital room by a Mrs. Buisson, who was attending a member of her family in the other bed in the same room. The time was 4:20 a. m. Miss Lindsey found Mrs. De Blanc on the floor and asked her what happened and testified: "She said she was trying to get up to go to the bathroom and missed the footstool and fell." The footstool was was under the bed where the patient could not step on it. She further testified: "She [Mrs. De Blanc] appeared alert and awake. I asked her what happened and she said that she had fallen while getting up to go to the bathroom, she had missed the footstool, and I told her she should have called for help and she said she didn't want to bother anyone."
When Mr. De Blanc arrived at the hospital about 6 a. m. and learned of his wife's accident, in response to his inquiry addressed to her she said: "I took my sleeping shot and the next thing that I know was that I found myself on the floor."
We are of the opinion that Mrs. De Blanc attempted to go to the bathroom without calling for assistance in violation of specific orders of her physician. In doing so she assumed the risk of fallinga danger which her doctor had considered and for which reason he forbade her to go to the bathroom without help. In view of our conclusion that the hospital employees were free from negligence there is no need for discussion of the alternative plea of contributory negligence.
We fully concur with the findings of fact and conclusions of the trial judge which are fully and ably set out in his reasons for judgment. He correctly held that plaintiff failed to establish that the hospital owed a duty to maintain bed rails for Mrs. De Blanc's safety and that the hospital was not an insurer of her safety. While we can find no case directly on this point in our jurisprudence, we quote with approval the language found in 41 C.J.S. Hospitals §8 c(3):
"* * * [A] private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen."
We are convinced that the hospital exercised the care reasonably to be expected in view of the patient's condition and in the absence of specific orders from her attending physician for special care or protection.
The invocation of the doctrine of res ipsa loquitur which plaintiff pleaded alternatively is not called for here. The factual situation does not establish the basis for the application of the doctrine and the case is clearly distinguishable factually from Jacobs v. Beck, 141 So.2d 920 (La.App. 4th Cir. 1962); and Andrepont v. Ochsner, 84 So.2d 63 (La.App. Orleans 1955), cited and relied on by plaintiff, in which the doctrine was applied.
Furthermore the case is clearly distinguishable in respect to the factual circumstances from D'Antoni v. Sara Mayo Hospital, 144 So.2d 643 (La.App. 4th Cir. 1962). There we affirmed a judgment of damages for a hospital patient who fell out of bed because the side rails were not in position. We found the facts there to be in part as follows:
"When plaintiff was admitted to the hospital a notation was made on her admit card that she was 62 years old, that *872 she had cirrhosis of the liver and that she suffered from tonic-clonic jerkings and epileptic and psychomotor seizures that were sudden and unpredictable in onset. Her attending physician, Dr. Bernard Richmond, testified that he ordered side rails to be placed and maintained on her bed at all times. * * *" 144 So.2d at 645.
We stated:
"We are of the opinion that the hospital attendants and nurses were negligent in not maintaining the side rails in place at all times in accordance with the doctor's orders, and that the absence of the side rail was the proximate cause of the accident." 144 So.2d at 646.
There is no conflict whatever between our judgment in that case on the facts presented and our judgment in this case.
The judgment rejecting plaintiff's demands and dismissing plaintiff's suit against all defendants at his cost is affirmed.
Affirmed.