GUIDRY, Judge.
Evelyn Berry Tolbert instituted this action individually and on behalf of her minor daughter, Mary Tolbert, seeking damages from the State of Louisiana through the Louisiana Health and Human Resources Administration. On May 29, 1976, while Mary Tolbert (then fourteen years of age) was a patient at Central Louisiana State Hospital in Pineville, Louisiana (Central), *167 she and several other patients entered a vacant building on the grounds of Central, where they became intoxicated and engaged in sexual activities. Plaintiff brought suit against the State of Louisiana, alleging that this incident occurred and the damages resulted solely by reason of Central’s failure to adequately supervise and protect its patients. Mrs. Tolbert further alleges that as a direct result of this incident, she has suffered mental anguish and has incurred numerous medical expenses. Prior to trial, Mary Tolbert married James Richard Calendar, and was substituted as a party plaintiff. The district judge rendered judgment in favor of defendant and against Evelyn Berry Tolbert and Mary Tolbert Calendar, and plaintiffs have appealed. The issues raised on appeal are as follows:
1. DID CENTRAL BREACH ITS DUTY OF CARE TO MARY TOL-BERT CALENDAR?
2. DID THE TRIAL COURT ERR IN FINDING THAT EVELYN BERRY TOLBERT COULD NOT RECOVER FOR MENTAL ANGUISH ARISING FROM THIS INCIDENT?
I. DID CENTRAL BREACH ITS DUTY OF CARE TO MARY TOLBERT CALENDAR?
Mary Tolbert was committed to Central on May 25, 1976. The facts giving rise to her commitment are as follows: When Mary was twelve years old, she began to drink alcohol and to sneak out of her home at night against her mother’s will. Mary’s parents were separated, and she resided with her mother. Mrs. Tolbert testified that whenever she permitted Mary to go out, she (Mary) would “go off with” boys. Mary testified that the purpose of her night time excursions was to ride around and drink with her friends. When Mrs. Tolbert was no longer able to discipline her daughter, nor to prevent her from sneaking out of the house at night, she sought the help of a probation officer, Mr. Grier, who agreed to counsel Mary on an informal basis. Mary’s disrespectful attitude nevertheless continued, as did her evening rendezvous. Mrs. Tolbert then sought the aid of a juvenile judge, who placed Mary on probation and (with Mrs. Tolbert’s approval) sent her to the Youth House in Monroe, Louisiana. Mary was admitted to the Youth House in January, 1976. At Youth House, Mary was permitted to attend public school, and to go home on weekends. The records from Youth House indicate that while she was there, Mary had difficulty socializing with other residents, and often engaged in what the staff considered to be “attention getting devices”. The records further reveal that in February, 1976 Mrs. Tolbert went to the Youth House and reported to a staff member that Mary had gotten drunk when she was at home. In March, 1976 Mary and another resident were involved in an incident in which they escaped from Youth House one night, first claiming that they had been running away, and then admitting that they had planned to meet two men for a date. In early May, 1976 Mary told the residents and staff at the Youth House that she believed she was pregnant. When initial medical tests verified her pregnancy, Mrs. Tolbert was contacted and asked to come to the Youth House for a meeting with the staff. The record indicates that at this meeting, and in the presence of her mother, Mary admitted that when she went home on weekends she was engaging in sexual activities. Subsequent medical tests did, however, reveal that Mary was not pregnant. Shortly after this episode, Mary swallowed ten or eleven diet pills which she had gotten from home the prior weekend, and was taken to E. A. Conway Hospital. Her apparent suicide attempt was categorized in the Youth House records as another attention getting device. Mary stated that she had taken the pills because she was mad at a girl at school who liked the same boy that she did. While at E. A. Conway Hospital, Mary cut one of her wrists with a plastic knife, and arrangements were then made to transfer her to Central under a coroner’s commitment dated May 25, 1976.
At the time of Mary’s commitment, Central was under the administration of Dr. Roy Hill, who testified concerning the procedures which were taken at that time to *168 admit and house new patients. Dr. Hill testified that the staff first determined the nature of the patient’s commitment, i. e., whether it was voluntary or involuntary, and then assigned a “treatment team” to the patient, consisting of a psychiatrist, psychologist, nurse and social worker. Then a psychiatric and social history was compiled from information obtained from those accompanying the patient to Central and from the patient himself. The patient was then given a physical examination, and laboratory tests were performed. The treatment team then evaluated the data compiled on the patient, and prescribed a course of treatment. During the period of evaluation the patient was housed at Unit 1.
Unit 1 at Central is a so-called “closed unit”. All new patients enter this unit, segregated by sexes, while recommendations are being made for that patient’s course of treatment. The doors of Unit 1 are locked 24 hours a day, and no patient is permitted outside the unit without the permission and accompaniment of a staff member. While the patient stays at Unit 1, his treatment team makes behavioral observations and the attendants on duty within the unit make periodic reports on the patient’s conduct, attitude, and his adaptation to his environment. It was not Central’s policy at the time of the incident to keep a patient in Unit 1 until all reports were received from all doctors and institutions that might have previously cared for him. When the treatment team determined that a patient’s behavior and known history warranted such action, they would reassign the patient to a less restrictive unit pending receipt of such reports. In the instant case, Mary had been in Unit 1 for two days when her treatment team determined that she was able to be reassigned to a less restrictive area. Accordingly, she was placed in Unit 17. At Unit 17, the doors of the building remained locked from approximately 4:00 p. m. until 6:00 a. m. At other times during the day, the patients housed in this unit are permitted to come and go as they please. The staff asks the patients to sign in and out on a voluntary basis, indicating where they are going and how long they intend to be. Staff members within the unit take a roll call of the patients in the morning and in the afternoon, and make periodic checks on the patients throughout the day. Only female patients are housed at Unit 17.
The incident in dispute occurred on May 29, 1976, two days after Mary was assigned to Unit 17. In a statement prepared for the police by Mary on June 1, 1976, she related the facts concerning the incident as follows:
“. . . On Saturday, 5-29 — 76, I went and got some breakfast and a little later we, Wilson, James, Cynthia and I were out front of Building #17, and Wilson mentioned something about all of us going to Building # 15, which is an empty building. I said, no, that I was going to go inside and get some sleep. I went in and a little while later I did go to sleep. The next thing I remember Cynthia came in and woke me up and said for me to come go with her to Building # 15, that they had something to drink. I said no. Cynthia left and it seemed like about 15 minutes later Cynthia came back and told me that James wanted me to come go with her. Cynthia and I walked towards Building # 15 and we met James and a patient names (sic) Jack. (I don’t know his last name). James and Jack were sitting on the steps playing a radio. Jack and Cynthia walked up to the door of the building and I asked Cynthia where she was going. She said inside, that they had something to drink. James called to them to fix the door, so I would’nt (sic) get locked out. I got up and went into the building (15) with Jack and Cynthia and then James followed us inside. I did not see anyone unlock the door, they just seemed to walk on into the building. When we all got into the building, I laid down by the counter and Jack, Cynthia and James all walked on to the back of the building. I would like to add that prior to James coming into the building, I had kind of stayed up front. Cynthia and Jack walked on to the back, then Cynthia came and got me and I went to the back. While in the back of the building, Cyn *169 thia gave me a cup and fixed me a drink, which was coke and Vodka. I drank some of it and it seemed to be strong. James came in and Cynthia fixed James a drink, and gave it to him. James and I then went to the other side of the room divider (half wall). James and I sit (sic) on the floor and drank our drinks and played the radio. While we were sitting and talking drinking our drinks, I got up and went around the room divider to get some orange juice, I saw Cynthia lying on the floor on her back and she didn’t have on any clothing, nothing at all./ (sic) Jack was sitting up and he didn’t have on any clothes either. He was sitting by Cynthia. I got the orange juice and went back to where James was. James had kissed me some before I went to get the juice. When I got back to James, I fixed me another drink and sat by James. We drank and James started kissing on me. James started taking my clothes off and I let him do it, he took all my clothes off and then he took all his clothes off but his shirt. James then got on top of me and we had sex. After we had sex on the floor, James got up and so did I. I got dressed and so did James. We sat and talked some more and I went to check on Cynthia, but they had already gone. I went back to James, then I remember someone knocking on the back door. James went to see who it was and after that I’m not able to remember to (sic) much. I guess I drank about three strong drinks of Vodka with coke and orange juice. I guess it was about 10:00 a. m. when we went to the building and around 11:00 a. m. some of the nurses came in and got us, Cynthia and I. I guess James and Jack ran off because I remember someone running off but I don’t know who. .

I can state that when I went into the building with James, I kind of knew what might happen, but I wasnt (sic) sure that I would let it happen. After we got in the building and started drinking and James started kissing me and messing around, I knew what was going to happen. I knew James wanted sex with me and I let him, do it. .

The record reflects that it was the arrival of a visitor for Cynthia at 10:15 a. m. which prompted the nurse on duty to commence a search for the girls and to notify hospital security that they were unaccounted for.
Plaintiffs allege that Central’s decision to transfer Mary to Unit 17 constituted a breach of its duty of care to her. It is contended by plaintiffs that Mary should not have been permitted to mingle with adults, particularly adult males, and that Central should have awaited reports from the Youth House and from E. A. Conway Hospital before moving Mary out of Unit 1. Plaintiffs further contend that Mary was a borderline mental retardate who did not have the mental capacity to comprehend what she was doing, or to give knowing consent to an act of sexual intercourse. Plaintiffs likewise assert that Central did not give credence to the standard form of the coroner’s commitment, which contained the following language:

“This certifies that Marv Tolbert is suffering from a mental illness which causes him to be dangerous to himself or others and makes him incapable of caring for himself or his personal safety . . .”

In its written reasons for judgment, the trial court made the following factual findings:

“1. Mary was never shown at the trial to have ever been suffering from any mental illness. The physicians at Central diagnosed her condition as ‘adjustment reaction of adolescence.’ As a layman listening to the technical explanation of this terminology, it appears to cover the situation all too common in life, well familiar to the courts, of juveniles who simply rebel against authority and who adopt a pattern of life in which they do as they please. This is usually in defiance of parents and all other authority.

2. Mary had twice displayed a reckless volition to endanger her life, which she evidently desired to be interpreted as suicide attempts.

*170
3. Mary had often been drunk by her own admission. It was her testimony that she only drank beer because hard liquor would ‘put her out’ rather quickly.

4. Mary was sexually wise. While there is no evidence that she was promis-cious in the broadest sense of the word, her frequent visits with her male friend at Columbia while she was at Youth House established that she had been fairly well introduced to the phenomenon of sex. Her discussion of her fear of pregnancy because she had missed her period after some of these visits shows her knowledge of the consequence of sexual intercourse.

5. Mary seems to be intelligent. Despite the testimony by deposition of Dr. James H. Philips, which the undersigned largely discounts, Mary testified in a manner which was convincing that she was a girl of normal intelligence and the undersigned considered her to be quite bright. Dr. Hugh King of the Central staff, on cross-examination, agreed with Dr. Philips that on the basis of Mary’s IQ score that she was on the border line of mental retardation. Nevertheless, on the questioning Dr. King by the undersigned, he stated that Mary was capable of finishing high school and that many persons of her IQ obtain college degrees. He estimated that, in a rough approximation, 65% of the population would have a higher IQ than Mary.”

The trial court concluded:
.. . From the facts and circumstances set out above in this case and the law applicable to them, it can be seen that the State has not breached the duty it owed to Miss Tolbert, and therefore is not liable for damages to her. Central did take reasonable precautionary measures to prevent its patients from being harmed. As was shown by the testimony of Doctors Hill and King, the hospital followed accepted psychiatric procedures by not confining Mary behind bars. It was also established at trial that Central did take measures to secure the hospital grounds and to protect its patients. If the Court was to hold, based upon the facts and circumstances of the present case, that Central had breached its duty of providing adequate supervision, the Court would, in effect, be making the hospital an insurer of its patient’s safety in violation of the line of cases cited in the quotation from Moreaux[1] given above. Hence, even if the plaintiffs had surmounted all of the factual obstacles, they still could not recover since the State was in no way negligent .
Mary voluntarily got up from her own bed in the ward where she was assigned and went to an empty building to engage in drinking with males and another female. She might have done the same from her own home. For the purposes of drinking she had done this very thing— leaving her mother’s home — on numerous occasions since she was twelve years old. Considering her intelligence and sexual experience, Mary was fully aware of the probable consequences of meeting with the men in question. She so testified. Does the State at institutions such as Central have the duty to impose foolproof restraint with reference to the moral conduct of its inmates? Even as to fourteen year olds, does the State have the duty? The undersigned is of the opinion that the state has no such duty with respect to persons of Mary’s age and intelligence.”
We find the trial court’s factual findings to be supported by the record, and concur in its determination that Central did not breach its duty of care to Mary.
In Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974), the Louisiana Supreme Court set forth the standard of care applicable to hospitals as follows:

“A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may require. It is the hospital’s duty to protect a patient from dangers that may result from the patient’s physical and mental 
*171
incapacities as well as from external circumstances peculiarly within the hospital’s control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.” at pg. 747.

In Jenkins v. Bogalusa Community Medical Center, 340 So.2d 1065 (La.App. 1st Cir. 1976) the court stated:

“. . .A hospital is not an insurer of a patient’s safety. The duty owed by hospitals to patients is not designed to protect a patient against risks which patients who are aware of their surroundings and who are mentally capable should reasonably anticipate. See e. g., Killgore v. Argonaut-Southwest Insurance Company. 216 So.2d 108 (La.App. 2nd Cir. 1968); DeBlanc v. Southern Baptist Hospital. 207 So.2d 868 (La.App. 4th Cir. 1968); Noble v. Insurance Company of North America. 248 So.2d 12 (La.App. 1st Cir. 1971).” at pg. 1067.

A hospital must exercise such care of a patient as the patient’s known condition and the facts and circumstances peculiarly applicable to that patient on that particular occasion require. Meynier v. De-Paul Hospital, 218 So.2d 98 (La.App. 4th Cir. 1969).
On the day that Mary was admitted to Central, her history was compiled by a staff social worker, based upon information supplied by Mrs. Tolbert. As previously stated, the contents of this history was considered by Mary’s treatment team in evaluating her condition and prescribing a course of treatment for her. Examination of this history reveals that in part, Mrs. Tolbert supplied Central with the following information: Mary had, at times, left her mother’s home without permission “during the late hours of the night”: while she was at the Youth House, Mary had run away several times; once she “. . . even told a lie that she was pregnant”. According to this history, the factor which precipitated Mary’s commitment to Central was her overdose of diet pills at Youth House. The report is void, however, of any reference to possible promiscuity on Mary’s part or to any other reason why it might be in Mary’s best interest to segregate her from the male patients at Central. There is likewise no mention of the fact that she had been drinking for some time prior to her commitment.[2] It might be noted that the following statement appears in the report: “Mrs. Tolbert requested that if at all possible the patient be referred to Unit 40 for treatment.”[3]
In sum, the staff at Central made every reasonable effort to determine all of Mary’s problems from the day of her commitment. However, its staff was given no reason whatever to believe that Mary would, if given even an hour of freedom, consensually engage in sexual activities or drink alcohol on the grounds of the hospital. Behavioral observations made by staff members at Unit 1 revealed that she was behaving normally, socializing well, and adapting to her surroundings without difficulty. Her treatment team apparently determined that while her behavior did not entitle her to all the freedoms available at Unit 40, it did warrant a transfer to Unit 17. Dr. Hill testified that the transfer was made pursuant to accepted modern psychiatric procedures.
We conclude, as did the trial court, that based upon the record Mary clearly had the mental capacity to understand the consequences of her actions, i. e., of drinking alcohol and of engaging in sexual intercourse. She voluntarily left Unit 17 to enter Unit 15 with four males and one female for the purpose of drinking alcohol. She stated that before she did so, she anticipated that sexual advances would be made toward her. She likewise stated that she *172 voluntarily drank the alcohol and voluntarily engaged in sexual activities with at least one of the males. We find that under the particular facts herein presented, Central’s duty of care to Mary did not include placing her behind locked doors all day until every report was received from each doctor and institution which had treated her prior to her commitment. Nor did its duty include guaranteeing that Mary would not have access to alcohol brought onto the hospital’s premises in direct contravention of Central’s rules prohibiting such. We find from the record that Central made every reasonable effort to keep alcohol off of its premises. Central’s actions with regard to Mary’s treatment did not fall below the standard of care required of it.
We are not prompted to conclude otherwise because of the language of the coroner’s commitment to the effect that Mary suffered from a mental illness which made her dangerous to herself and others. This statement was printed on each coroner’s commitment form. It was never, however, intended to be a medical diagnosis of every patient committed to Central by coroner’s commitment. Consequently, it did not, and should not have played any significant part in Central’s evaluation and treatment of the patient’s condition. We therefore affirm the judgment of the trial court dismissing Mary Tolbert Calendar’s action against defendants.
In light of the fact that Mrs. Evelyn Berry Tolbert’s claim for damages is based upon the alleged breach of Central’s duty of care to her daughter, we likewise affirm the trial court’s dismissal of her action.
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of these proceedings are to be paid by appellants.
AFFIRMED.

. The case of Moreaux v. Argonaut Insurance Company is reported at 350 So.2d 240 (La. App.3rd Cir., 1977), writ refused, November 11, 1977.

. In the course of a physical examination conducted on May 25, 1976 by Central, Mary herself denied the use of alcohol.

. Unit 40 was part of the adolescent program at Central, which was unlocked. It was located on the perimeter of the hospital’s grounds adjacent to a public road and was considered by the administrator of Central to be a much less restrictive Unit than both Units 1 and 17.